OPINION
RESTANI, Judge:
Travelers Insurance Company (“Travelers”) appeals from the decision of the district court, 129 B.R. 440, that upheld the bankruptcy court’s order confirming a reorganization plan filed by the debtor, Bryson Properties XVIII (“Bryson”). We reverse and remand on the grounds that the reorganization plan is not fair and equitable to Travelers.
The debtor, Bryson, is a limited partnership organized under Illinois law; the principal place of business of its general partner is Durham, North Carolina. Bryson’s sole asset is a complex of three commercial buildings in Omaha, Nebraska, known as “Mid-America Plaza.”
Bryson purchased Mid-America Plaza on November 14, 1986, subject to a first mortgage in favor of Travelers, and assumed the seller’s obligations under a ten-year nonrecourse note in the face amount of $10.8 million. Bryson made payments on the note for approximately three years, then defaulted. On September 27, 1989, Bryson filed a voluntary petition to reorganize under Chapter 11 of the Bankruptcy Code.
Bryson filed for relief under Chapter 11 for several reasons: loss of an anchor tenant; discovery of asbestos in all *499 three of its buildings; a “soft” real estate market for commercial buildings; and notice from Travelers of its intent to commence foreclosure proceedings. At the time of filing, the amount due on the note was $11,234,306. Travelers’ claim against the debtor consists of (1) a secured claim equal to the value of the debtor’s interest in Mid America Plaza — $7,905,068; and (2) an unsecured deficiency claim in the amount of $3,329,23s.[1]
On June 18, 1990, the debtor filed the Third Amended Plan of Reorganization (“Plan”).[2] The Plan divides claims and interests into eight classes:
(1) administrative expenses; (2) tenant security deposits; (3) secured tax claims; (4) Travelers’ secured claim; (5) the unsecured claim of Continental Bank; (6) the unsecured claims of trade creditors; (7) Travelers’ unsecured claim; and (8) equity interests of the Debtor’s partners.
Appellant’s Brief at 5; see Joint Appendix (“J.A.”) at 123-24. The Plan provides that the debtor’s partners will make a cash contribution to the debtor of $625,000 and extend a line of credit of $850,000. In consideration for their contribution, the partners will retain their interest in the partnership. The Plan treats Travelers’ secured claim as follows:
(1) interest only at the rate of 9.25 percent during years one through three; (2) interest only at the rate of 9.5 percent for years four and five; (3) interest only at the rate of 10 percent for years six and seven; (4) interest only at the rate of 10.5 percent for years eight through ten; (5) a final balloon payment of all remaining principal and interest at the end of ten years.
Appellant’s Brief at 10, see J.A. at 130-31. Total payments equal $16,010,590. J.A. at 131.
As for Travelers’ Class seven unsecured claim, the Plan provides that Travelers will receive 3.5 percent of its claim in full satisfaction of the debt. The Class five and six unsecured claims also receive 3.5 percent of their claims; however, outside of bankruptcy, the general partner remains liable for the balance of the Class six claims under general partnership law, and certain partners have personally guaranteed the Class five claim.
In the event the property is sold or refinanced within ten years, the Plan provides for the proceeds to be paid as follows:
$7,905,068 to Travelers, as the outstanding amount on the secured claim; payment of the [$850,000] line of credit provided by the partners; payment of the new cash contribution of the partners ... in the amount of $625,000; payment to Travelers of any difference in the amount of principal balance shown on the amortization schedule (amortizing the original loan amount of 10.8 million at 5.25 percent) and the principal balance of the secured claim of $7,905,068; and Travelers shares in any net profit thereafter in an amount equal to 33.3 percent.
Appellee’s Brief at 5; see J.A. 128-29. The Bankruptcy court approved the Plan, and the district court affirmed. This appeal followed.
STANDARD OF REVIEW
The district court’s decision is reviewed de novo. In re Camino Real Landscape Maintenance Contractors, 818 F.2d 1503, 1505 (9th Cir.1987). The bankruptcy court’s findings of fact are reviewed under the clearly erroneous standard (Fed. R.Bankr.P. 8013; Willemain v. Kivitz, 764 F.2d 1019, 1022 (4th Cir.1985)); its conclusions of law are reviewed de novo. Quinn Wholesale, Inc. v. Northern, 100 B.R. 271, 273, (M.D.N.C.1988), aff'd, 873 F.2d 77 (4th Cir.), cert. denied, 493 U.S. 851, 110 S.Ct. 151, 107 L.Ed.2d 109 (1989).
*500 DISCUSSION
1. Secured Claim
Travelers argues the Plan is not fair and equitable because Travelers does not receive the present value of its secured claim.
Before a reorganization plan is confirmed, it must be accepted by all impaired classes of claims. See 11 U.S.C. § 1129(a)(8) (1988). If a class rejects the plan, the court may nevertheless confirm over the objection of impaired classes so long as the plan “does not discriminate unfairly, ... is fair and equitable” with respect to each impaired class of claims, and the other requirements of confirmation are met. 11 U.S.C. § 1129(b)(1) (1988).[3]
The “fair and equitable” requirement is not satisfied with respect to a secured claim unless the claimholder: (1) retains its lien; and (2) receives “deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder’s interest in the estate’s interest in such property.” 11 U.S.C. § 1129(b)(2)(A)(i)(I)-(II) (1988). The first requirement is not at issue in this case. Under the second requirement, total deferred payments must have a “present value” equal to the amount of the allowed secured claim.[4] In re Century Inv. Fund VII Ltd. Partnership, 96 B.R. 884, 889 (Bankr.E.D.Wis.1989) (citations omitted). Here, Travelers asserts that total deferred payments under the Plan are less than the present value of the claim.[5] Travelers makes three arguments.
First, Travelers argues that the debtor’s expert, Gary Rifkin, admitted that a loan with the terms required by the Second Amended Plan of Reorganization would not be made under current market conditions. Since no market for the loan exists, Travelers argues present value is not protected. This argument is without merit. Rifkin’s testimony pertained to loan terms set forth under the Second Amended Plan; this plan was not approved by the Bankruptcy Court.
Second, Travelers argues the Plan’s interest rates are below market rates for similar loans. Evidence presented by the debtor in support of the Second Amended Plan is to the contrary. Rifkin testified that a loan on property like Mid-America Plaza would have a term of three to five or seven to ten years, and an interest rate that was fixed or adjusted at certain intervals. He testified that the market rate for ten-year loans made by insurance companies over the three years prior to June 1990 ranged from 9.25 to 11 percent; for the one year period prior to June 1990, rates ranged between 8.5 percent and 10.25 percent. Rifkin further testified that the market rate of interest for the loan made by Travelers would be between 9.875 and 10.25 percent, and that participation rights might reduce this percentage by between one-eighth and one-quarter of a percent.[6] Finally, he testified that the rate on Treasury bills was 8.74 percent, and that rates for ten-year loans would be about one to two percent higher.
*501 Here, the interest rates under the Plan begin at 9.25 percent, then increase at two or three year intervals to 10.5 percent. These figures correspond to Rifkin’s testimony concerning the range of interest rates for the previous three-year period. In addition, allowing for an adjustment due to greater participation rights under the Third Amended Plan, these figures are also supported by Rifkin’s testimony on the market interest rate for the loan made by Travelers.[7]
Third, Travelers argues that the best evidence of the appropriate discount rate is the contract rate, which was 11.875 percent for five years, then 12.875 percent. Travelers relies on In re Monnier Bros., 755 F.2d 1336 (8th Cir.1985), a case in which the reorganization plan called for deferred debt payments. In that case, the district court reversed the bankruptcy court’s decision insofar as it fixed the interest rate at a rate below the contract rate, and reinstated the contract rate. The Eighth Circuit affirmed, finding that neither party provided the bankruptcy court with sufficient evidence to enable it to determine the present value of the creditor’s money. Under these circumstances, the court held, the contract rate, negotiated only twenty months earlier, reflected present value. Id. at 1339. This case is distinguishable from the case at bar in which the debtor introduced evidence of the present value of the debt. This evidence was a more reliable indicator than the contract rate.
In summary, Travelers’ arguments concerning present value are unpersuasive, and the district court did not err in affirming the bankruptcy court’s finding that the Plan gives Travelers an amount equal to the present value of its claim.
2. Unsecured Claim
Travelers makes the following arguments with respect to treatment of its unsecured claim: (a) Bryson manipulated classification of claims for the purpose of obtaining a confirmable plan; and (b) the Plan violates the absolute priority rule.
a. Manipulation of Voting
Before a plan can be crammed down, at least one noninsider impaired class of claims must vote to accept it. See 11 U.S.C. §§ 1129(a)(10), 1129(b)(1) (1988). Here, although all unsecured claims are purportedly treated alike under the Plan, Bryson separated unsecured claims into three classes. Classes five and six voted to accept, and Class seven, consisting of Travelers' claim, voted to reject. Travelers argues that without separate classification of unsecured claims the Plan could not have been confirmed.[8] 11 U.S.C. § 1122 pertains to classification of claims and interests under a reorganization plan. It provides:
(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court ap *502 proves as reasonable and necessary for administrative convenience.
11 U.S.C. § 1122 (1988). Section 1122 requires substantial similarity between claims that are placed in the same class. It does not, however, require that all substantially similar claims be placed within the same class, and it grants some flexibility in classification of unsecured claims. Nonetheless, as several courts have held, there is a limit on the debtor’s power to classify claims:
Although the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case, this discretion is not unlimited. There must be some limit on the debtor’s power to classify creditors_ The potential for abuse would be significant otherwise_ If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights, the plan cannot be confirmed.
In re Holywell Corp., 913 F.2d 873, 880 (11th Cir.1990) (citations omitted); see also In re Greystone III Joint Venture, 948 F.2d 134, 139 (5th Cir.1992) (as amended) (“thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan”). Thus, although separate classification of similar claims may not be prohibited, it “may only be undertaken for reasons independent of the debtor’s motivation to secure the vote of an impaired, assenting class of claims.” Greystone, 948 F.2d at 139.
Bryson claims that separate classification of unsecured claims is warranted because Travelers’ claim arises from a nonre-course loan, whereas the Class five and six claims are recourse loans. Travelers counters that under the Bankruptcy Code its nonrecourse claim is converted into a recourse claim, (see 11 U.S.C. § 1111(b)(1)(A) (1988)), and there is no basis for distinguishing between Code-created deficiency claims and “natural” recourse claims, where the claimholders have recourse as a matter of state law.
At least one court has held that the distinction between Code-created unsecured deficiency claims and other unsecured claims does not warrant separate classification. Greystone, 948 F.2d at 140.[9] Even if we adopt a flexible approach to § 1122, however, the classification scheme at issue is impermissible. Where all unsecured claims receive the same treatment in terms of the Plan distribution, separate classification on the basis of natural and unnatural recourse claims is, at a minimum, highly suspect. In this case, Bryson has failed to offer any reason for separate classification of the unsecured claims which will withstand scrutiny. The classification is clearly for the purpose of manipulating voting and it may not stand.[10]
Although a remand is necessary on the classification issue alone, for the sake of judicial economy, we will address Travelers’ argument that the Plan violates the absolute priority rule.
*503 b. Absolute Priority Rule and New Capital Exception
Travelers argues that the Plan violates the absolute priority rule because the debt- or’s partners retain their interest in the partnership even though Travelers’ unsecured claim is not paid in full. In addition, Travelers argues the rule is violated because, in the event the property is sold, the partners will recover their contribution before payment of Travelers’ unsecured claim.
The absolute priority rule provides that “a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.” Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988) (quoting Norwest Bank Worthington v. Ahlers, 794 F.2d 388, 401 (8th Cir.1986)); see also Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 116, 60 S.Ct. 1, 7, 84 L.Ed. 110 (1939). The rule was codified in 11 U.S.C. § 1129(b)(2)(B)(ii) of the Bankruptcy Code, enacted in 1978, which provides:
[T]he holder of any claim or interest that is junior to the claims of ... [the dissenting class] will not receive or retain under the plan on account of such junior claim or interest any property.
11 U.S.C. § 1129(b)(2)(B)(ii) (1988). The rule stems from the requirement that a plan must be fair and equitable before it can be confirmed over the objection of dissenting creditors. See 11 U.S.C. § 1129(b)(2); Ahlers, 485 U.S. at 202, 108 S.Ct. at 966.
In this case, it is clear that a junior class retains property under the Plan while a senior class of unsecured creditors is not paid in full. Bryson argues, however, and the district court held, that the Plan was confirmable because the absolute priority rule, as codified, includes the previously recognized “new capital exception.” The “new capital exception” was set forth by the Supreme Court in Los Angeles Lumber. There, the Court found:
It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor.... Where th[e] necessity [for new money] exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made.
308 U.S. at 121, 60 S.Ct. at 10.
Los Angeles Lumber was decided before the 1978 Bankruptcy Code was enacted, and the courts are divided as to whether codification of the absolute priority rule in § 1129(b)(2)(B)(ii) tolled a death knell for the exception.[11] The Supreme Court specifically declined to decide the issue in Ahlers. 485 U.S. at 203 n. 3, 108 S.Ct. at 967 n. 3. Since that time, several circuit courts have questioned the continuing viability of the exception or have otherwise passed over the issue, but have not decided it. Greystone, 948 F.2d at 142 (vacating bankruptcy court’s opinion upholding new value exception but declining to rule on question); Kham & Nate’s Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1361-63 (7th Cir.1990) (questioning vitality of exception but finding it inapplicable on facts); In re U.S. Truck Co., 800 F.2d 581, 588 (6th Cir.1986) (applying exception without discussion). The bankruptcy courts are divided on the issue. Compare, e.g., In re Woodscape Ltd. Partnership, 134 B.R. 165, 175 (Bankr.D.Md.1991) (new capital exception not barred by statute; adequacy of new value contribution determined on facts); In re 222 Liberty Assocs., 108 B.R. 971, 984-85 (Bankr.E.D.Pa.1990) (exception exists when there is present contribution with showing of necessity for contribution); In re Snyder, 99 B.R. 885, 888 (Bankr.C.D.Ill.1989) (exception viable until eliminated by higher court), with In re Out *504 look/Century Ltd., 127 B.R. 650, 656 (Bankr.N.D.Cal.1991) (exception no longer viable based on plain language of statute); Piedmont Assocs. v. Cigna Property & Casualty Ins. Co., 132 B.R. 75, 79 (N.D.Ga.1991) (statutory language and Congressional intent preclude exception; exception inapplicable on facts); In re Lumber Exchange Ltd. Partnership, 125 B.R. 1000, 1008 (Bankr.D.Minn.) (confirmation improper where plan gives debtor’s equity security holders a special right to retain or acquire interest through cash contribution; exception not applicable on facts), aff'd, 134 B.R. 354 (D.Minn.1991).
There is no clear bankruptcy policy which dictates a result. On the one hand, Congress might have intended that some exception continue because an infusion of new capital may be essential to the success of a new venture and the equityholders are a natural source for this capital. See Kansas City Terminal Ry. Co. v. Central Union Trust Co., 271 U.S. 445, 455, 46 S.Ct. 549, 551, 70 L.Ed. 1028 (1926). On the other hand, if the reorganization plan represents a reasonable business risk, creditors should be willing to forego immediate recoveries in exchange for the expectation of greater recoveries in the future, in which ease they would consent to viable plans providing for new capital infusions.[12] See Kham & Nate’s Shoes, 908 F.2d at 1360.
Whether or not Congress was making a broad policy choice as to debtor or creditor control, the plain words of the statute provide an answer under the particular facts of this case.[13] The question is whether the equityholders receive anything “on account of” their prior interest. Under the Bankruptcy Code, the debtor has the exclusive right to propose a reorganization plan for 120 days. 11 U.S.C. § 1121(b) (1988). In the proposed Plan, the equity-holders have given themselves not only the exclusive right to contribute, but the right to return of their new capital prior to Travelers’ recovery of its unsecured claim. As Travelers states in its brief: “the debtor’s equity holders were the only parties afforded the right to contribute new capital. In effect, they were allowed to ‘buy’ the property without exposing it to the market or otherwise allowing any other party, including Travelers, the opportunity to bid.” Appellant’s Brief, at 29. This exclusive right to contribute constitutes “property” under § 1129(b)(2)(B)(ii), which was received or retained on account of a prior interest. Lumber Exchange, 125 B.R. at 1008 (special opportunity for equityholders to retain or acquire interest through new cash contribution is necessarily right to receive or retain property on account of prior inter *505 est);[14] /w re Outlook/Century Ltd., 127 B.R. at 654 (partners’ exclusive right to obtain equity interests in debtor constitutes property that the partners retain “on account of” existing interests); Piedmont Assocs., 132 B.R. at 79 (without ability to structure reorganization plan, partner would be unable to maintain interest by “buying” interest in debtor without public sale).
Finally, while it is not impermissible to propose a plan which only adjusts the interests of one creditor, this situation certainly must cause a court to scrutinize closely the equities involved. Under the Plan or through outside payments, the claims of all creditors, other than Travelers, will be paid in full. Only Travelers is truly impaired. This combination of factors leads us to conclude that even if some limited new capital exception were viable under the Bankruptcy Code, it would not be so expansive as to apply under the facts of this case. A plan must be fair and equitable in a broad sense, as well as in the particular manner specified in 11 U.S.C. § 1129(b)(2). Here, the debtors have carried their opportunity for self-dealing too far.[15]
CONCLUSION
The district court’s decision affirming confirmation of the Plan by the bankruptcy court is reversed, and the case is remanded to the bankruptcy court for further findings consistent with this opinion.

REVERSED AND REMANDED.

. In bankruptcy cases where the debtor proposes to retain the property, a claim secured by a lien on the property is converted to a recourse obligation; thus, Travelers’ claim is not limited to the value of the debtor's interest in Mid-America Plaza. See 11 U.S.C. § 1111(b)(1)(A) (1988).

. The bankruptcy judge rejected the Second Amended Plan on the grounds that it was not fair and equitable to Travelers.

. 11 U.S.C. § 1129(b)(1) is called the "cram down" provision; as indicated, it allows confirmation of the plan over the objection of dissenting classes.

. "Present value” includes the “time value of money,” and "compensates the creditor for not receiving its money today by charging an additional sum based on a rate of interest called the 'discount rate.’ ” In re S.E.T. Income Properties, III, 83 B.R. 791, 793 (Bankr.N.D.Okla.1988). The parties agree that Collier's rule applies to determine the discount rate:
The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the Court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration to the quality of the security and the risk of subsequent default.
5 Collier on Bankruptcy, ¶ 1129.03(4)(f)(i) (15th ed. 1990) at 1129-85.

. The Bankruptcy judge's findings on this issue are reviewed under the clearly erroneous standard. See Camino, 818 F.2d at 1508.

. In the Second Amended Plan, Travelers’ participation in the proceeds of a sale was 20 percent; in the Third Amended Plan, it is increased to 33.33 percent.

. Travelers also argues the Plan permits the debtor to defer payment of the prevailing market rate until the last five years of the loan, causing the loan amount to increase or “negatively amortize." Travelers’ argument is based on a faulty premise because the initial interest rate of 9.25 percent is within the range of prevailing market rates.

. Class three — unpaid ad valorem taxes — also voted to accept. ¡For Travelers to succeed with its argument that the debtor manipulated classes to obtain a confirmable plan, the acceptance of the Class three claims would have to be disregarded. In In re Perdido Motel Group, Inc., 101 B.R. 289 (Bankr.N.D.Ala.1989), the court noted that priority tax claims are not designated as a “class” within the definition of § 1123(a). Id. at 294. The court held that acceptance of a plan by priority tax claimants is not acceptance by a “class” of impaired claims under § 1129(a)(10) for purposes of cram down. Id.; see also In re Winters, 99 B.R. 658, 663-64 (Bankr.W.D.Pa.1989) (whether priority tax creditors are paid according to statute or agree to a different treatment, they are not an impaired class for purposes of cram down). We agree that priority tax claimants, which receive preferential treatment under the Code (see 11 U.S.C. § 1129(a)(9)(C)), are not an impaired class that can accept a plan and bind other truly impaired creditors to a cram down.

. But see In re Aztec Co., 107 B.R. 585, 592 (Bankr.M.D.Tenn.1989) (“unfair discrimination” determination requires consideration of totality of circumstances: existence of "natural” and "unnatural” recourse claimants is factor to consider but is not outcome determinative).

. Travelers argues that dissimilar treatment of the unsecured claims outside the Plan is improper. This argument has no merit. The unsecured claims receive the same treatment in terms of the Plan distribution, and there is no support for the position that Travelers’ unsecured claim should result in personal liability for the partners outside of bankruptcy. As Collier states:
There has been some concern expressed as to the effect of the conversion of a nonre-course claim to a recourse claim under § 1111(b)(1). One of the areas of concern is whether the conversion of a nonrecourse claim against partnership property creates a recourse claim against the individual partners who, absent the nonrecourse covenant, would be liable for the partnership debt. It is suggested that in adopting section 1111(b)(1), Congress did not intend to enlarge a creditor’s rights against parties other than the debtor.
5 Collier on Bankruptcy, ¶ 1111.02, at 1111-23.

. There is some debate as to whether it was a true exception or simply another aspect of the judge-made absolute priority rule. One author states that "use of the term 'exception' to describe new value principles is a catachresis ... [because] [t]he conditions required to satisfy the new value ‘exception’ also satisfy the absolute priority rule." Bruce A. Markell, Owners, Auctions, and Absolute Priority in Bankruptcy Reorganizations, 44 Stan.L.Rev. 69, 96 (Nov.1991).

. One commentator has noted that the Bankruptcy Code represents an accommodation between two competing interests — protection of creditors’ rights and the need for successful reorganization. David A. Skeel, The Uncertain State of An Unstated Rule: Bankruptcy’s Contribution Rule Doctrine After Ahlers, 63 Am.Bankr. L.J. 221, 223 (1989). He states that the absolute priority rule and the new capital exception may be viewed as surrogates for these two competing goals. Id. at 229.

. The legislative history sheds little light on the picture; however, we note the statement on the floor by Congressman Edwards concerning § 1129(b)(2)(B)(ii). This statement indicates that the statutory language and its legislative history are not inconsistent: "[T]he plan may be confirmed if the impaired class of unsecured claims receives less than 100 cents on the dollar (or nothing at all) as long as no class junior to the dissenting class receives anything at all.” 124 Cong.Rec. 32,408 (1978).
Several courts have found it significant that Congress rejected a proposal by the Bankruptcy Commission which would have codified the new capital exception and permitted participation by equityholders based on contributions of "continued management ... essential to the business” or other "participation other than in money or money’s worth.” Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 137, 93d Cong., 1st Sess. pt. 2 at pp. 241-42; pt. 1 at p. 258, reprinted in Collier on Bankruptcy vol. 2 app. (15th ed. 1990); Kham & Nate’s Shoes, 908 F.2d at 1361-62. The proposed modification would have liberalized the absolute priority rule and recognized the types of intangible contributions that were rejected by the Supreme Court in Los Angeles Lumber. See H.R.Doc. No. 137, pt. 1 at p. 258. Rejection of this proposed modification indicates no more than Congress’s decision not to expand the exception (see Ahlers, 485 U.S. at 206, 108 S.Ct. at 968); it does not indicate rejection of the exception itself. Thus, the legislative history is inconclusive.

. In Lumber Exchange, the court stated:
A special opportunity or right afforded to members of a class of equity security holders to retain or acquire an equity position in a reorganized debtor through a new cash contribution under a plan is, by its very nature, the opportunity or right to receive or retain property on account of the prepetition interest held. When the opportunity is fulfilled, or the right exercised, clearly, the interest is retained or received on account of the prior interest, even though new consideration is paid in the transaction.
125 B.R. at 1008.

. See The Uncertain State of An Unstated Rule, 63 Am.Bankr.L.J. at 238 (noting that debtor’s exclusive privilege to propose reorganization plan in combination with contribution rule may lead to self-dealing); Owners, Auctions and Absolute Priority in Bankruptcy Reorganizations, 44 Stan.L.Rev. at 118-119 (proposing as means to equalize bargaining power that court find filing new value plan sufficient “cause” under statute to terminate debtor's exclusive right to propose plan).