Algernon L. BUTLER, Jr., Trustee in Bankruptcy for Cheryl Lynn Harper, Plaintiff-Appellee,

v.

NATIONSBANK, N.A. (formerly NCNB National Bank of North Carolina), Defendant-Appellant.

No. 94–1824.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 30, 1995.

Decided July 5, 1995.

**ARGUED:** David Alan Nash, Hogue, Hill, Jones, Nash & Lynch, Wilmington, NC, for appellant. Algernon Lee Butler, Jr., Wilmington, NC, for appellee.

Before MURNAGHAN and MICHAEL, Circuit Judges, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.

## OPINION

MURNAGHAN, Circuit Judge:

The instant case arose from the bankruptcy of Cheryl Lynn Harper. In July 1989, Cheryl's husband, James C. Harper, forged an endorsement on a check and deposited it into his trust account at what is now NationsBank ("the Bank"). In December 1989, James filed for relief in bankruptcy. When the payor bank of the check later notified NationsBank that the endorsement on the check had been forged, NationsBank attempted to recover the amount of the check from James, whose debts were discharged in bankruptcy on April 18, 1990. In June 1990, under a plan of repayment worked out with NationsBank, James and Cheryl jointly borrowed the amount that James owed to NationsBank from the Bank itself, and paid the proceeds of the loan back to NationsBank to satisfy James' debt.

In June 1992, Cheryl filed for relief in bankruptcy. The instant case arose when the Trustee in bankruptcy for her estate attempted to recover the loan proceeds transferred by Cheryl to NationsBank in June 1990. The Trustee asserted that half of the loan amount given to NationsBank by the Harpers belonged to Cheryl, and that the transfer of funds to the Bank should be set aside because it was fraudulent. He sought for her estate recovery from NationsBank of one-half of the loan amount.

The case was tried in the bankruptcy court, where the judge ordered NationsBank to pay the Trustee half of the loan amount. NationsBank appealed to the district court, which affirmed the findings of the bankruptcy court. NationsBank has now appealed to us, and we affirm.

## I.

On July 24, 1989, James, then a practicing attorney in North Carolina, deposited a check for $35,000 into his client trust account at North Carolina National Bank, the predecessor in interest to NationsBank. Before depositing the check, James forged the payee's signature. James' account at NationsBank was credited with $35,000, and the American Bank of the South, the payor bank of the check on which James forged the endorsement, paid the check.

James filed for Chapter 7 relief in bankruptcy on December 18, 1989. In his bankruptcy petition, he listed NationsBank as an unsecured creditor for $1,925, representing a line of credit on his office checking account, but did not list the $35,000 credit given to him by NationsBank on his forged endorsement. The $1,925 was later paid to NationsBank by order of the bankruptcy court.

On February 27, 1990, the American Bank of the South wrote to NationsBank, informing it of the forged endorsement and asking NationsBank for reimbursement of the $35,-000. NationsBank then attempted to collect the $35,000 from James. Since James was already facing criminal indictments for two other forgeries, he attempted to avoid further criminal prosecution by working out a repayment plan for his indebtedness with NationsBank. The plan negotiated between James and NationsBank provided that NationsBank would lend James and his wife the money that James owed the Bank, and the couple would jointly execute a promissory note, a deed of trust (covering real property which they owned as tenants by the entireties), and an assignment of military benefits in favor of NationsBank. James and Cheryl would then pay the money loaned to

them by NationsBank directly back to the Bank to cover James' debt. During his meeting with NationsBank, James informed the Bank that he had been involved in a bankruptcy proceeding in the previous year. On March 21, 1990, NationsBank received a report from the credit bureau which indicated that James had previously filed for bankruptcy.

James' debts were discharged in bankruptcy on April 18, 1990, pursuant to 11 U.S.C. § 727. The bankruptcy court mailed a notice of discharge to NationsBank on that day. On June 14, 1990, approximately two months after James' debts had been discharged by the bankruptcy court, the Harpers executed the note and the deed of trust, and NationsBank lent them $35,594, in accordance with the agreement which James had worked out with the Bank. The Harpers used the proceeds from the loan to satisfy what they believed to be a $35,000 debt to NationsBank arising from the forged endorsement.

On June 17, 1992, Cheryl filed a Chapter 7 petition in bankruptcy court. The instant case arose from an adversary proceeding instituted on September 14, 1992 by the Trustee of the Estate of Cheryl Lynn Harper against NationsBank in the United States Bankruptcy Court for the Eastern District of North Carolina, in which the Trustee attempted to set aside the transfer by Cheryl of her share of the proceeds from the note that she and her husband executed to NationsBank.[1] Her share of the proceeds, one-half of the total loan from NationsBank, amounted to $17,797. After a trial on September 29, 1993, the bankruptcy court ordered that the Trustee should recover the $17,797 from NationsBank, because the transfer of Cheryl's share of the loan was void as a fraudulent conveyance under North Carolina law. On November 5, 1993, NationsBank filed a motion to set aside or amend the judgment and order, which was denied by the bankruptcy court. The United States District Court for the Eastern District of North Carolina affirmed the bankruptcy court's rulings on appeal. NationsBank has appealed to this Court, seeking an order

---

1. The Trustee only challenged Cheryl's transfer to NationsBank of her one-half share of the loan proceeds. He did not challenge the loan made to Cheryl by NationsBank, or the promissory note or deed of trust executed by Cheryl.

setting aside the judgment in favor of the Trustee or modifying the judgment of the district court.

## II.

The Bankruptcy Code provides that the trustee in a bankruptcy proceeding "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim...." 11 U.S.C. § 544(b). The parties agree that "applicable law" in the instant case is the law of North Carolina, the state in which the transactions at issue took place.

 Under North Carolina law, certain transfers are deemed to be fraudulent and therefore void. *See* North Carolina General Statutes (N.C.G.S.) § 39–15. The Supreme Court of North Carolina, discussing North Carolina law on fraudulent conveyances, has stated the following: "If the conveyance is voluntary and the grantor does not retain property fully sufficient and available to pay his debts then existing, it is invalid as to creditors...." *Aman v. Waller*, 165 N.C. 224, 227, 81 S.E. 162, 164 (1914). A transfer is "voluntary" when the purchaser does not give value, *i.e.* does not pay a "reasonably fair price." *Chrysler Credit Corp. v. Burton*, 599 F.Supp. 1313, 1319 (M.D.N.C.1984) (quoting *Nytco Leasing, Inc. v. Southeastern Motels, Inc.*, 40 N.C.App. 120, 128, 252 S.E.2d 826, 832 (1979)). "It is important to note it is valuable consideration defined as a fair and reasonable price, not mere consideration, which shields a transfer from fraudulent conveyance law." *Burton*, 599 F.Supp. at 1319. Intent to defraud may be presumed where the transferor fails to retain property sufficient to pay his or her debts. *Id.*

The bankruptcy court in the instant case found that the transfer made by Cheryl to NationsBank satisfied both prongs of the *Aman* test for a fraudulent conveyance: the transfer was voluntary, and Cheryl did not retain sufficient funds to pay her creditors. The court found, first, that the $35,000 debt of James to NationsBank arose before James' petition in bankruptcy was filed, and therefore that the debt was discharged in April 1990, when James was discharged in

bankruptcy. Since there was no debt outstanding when James and Cheryl paid the loan money to NationsBank, Cheryl gained no valuable consideration for her transfer of loan proceeds to NationsBank, and the transfer was therefore voluntary under N.C.G.S. § 39.15. The bankruptcy court further found that Cheryl did not retain sufficient funds to pay her debts.

 We review the district court's decision affirming the bankruptcy court *de novo*. *In re Bryson Properties, XVIII*, 961 F.2d 496, 499 (4th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992); *In re Camino Real Landscape Maintenance Contractors, Inc.*, 818 F.2d 1503, 1505 (9th Cir. 1987). We thus perform a *de novo* review of the bankruptcy court's conclusions of law, and review the bankruptcy court's findings of fact for clear error. *In re Bryson*, 961 F.2d at 499; *In re Camino Contractors*, 818 F.2d at 1505.

## III.

As a preliminary matter, we do not accept NationsBank's contention that no transfer of funds from Cheryl to the Bank took place in the instant case. NationsBank asserts that Cheryl had no interest in the proceeds of the loan made by the Bank to the Harpers and therefore could not have transferred her share of those proceeds back to the Bank, because either (1) she was never in possession of the proceeds of the loan, or (2) she signed the promissory note as an accommodation party.

 First, there is no requirement that Cheryl must have seen the actual proceeds of the loan in order for her to be able to transfer those proceeds. The immediate application of the proceeds of the loan to the debt incurred by Cheryl's husband, at Cheryl's direction, constituted a transfer of funds. It is not necessary, in order for a transfer to take place, that a bank physically hand the money to the client, only for the client to hand it back to the bank. James testified that it was his understanding that Cheryl would have had a right to receive the loan proceeds. In addition, Thomas Dodson, the

senior banking executive for NationsBank in Wilmington, testified that funds were advanced to the Harpers based on the promissory note that they executed, and that the loan proceeds were applied according to instructions given by the Harpers. He stated, "We made a joint loan to James and Mrs. Harper with $35,000 that was to be used after the loan proceeds were received by them to pay off the forged endorsed check." NationsBank cites no authority for the proposition that the application of the loan proceeds by NationsBank directly to the supposed debt of James was not a "transfer." Both NationsBank and the Harpers intended Cheryl to receive loan proceeds that would be transferred immediately to satisfy James' supposed debt, and such a transfer did take place.

■■■ In addition, the evidence contradicts NationsBank's alternative argument that Cheryl signed the promissory note as an accommodation party and therefore that she was not entitled to any of the loan proceeds. N.C.G.S. § 25–3–415 states that "[a]n accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it." The official comment to this section points out that the liability of an accommodation party on the instrument depends on the capacity in which he or she signs. *Id.* cmt. 1. The North Carolina courts have further analyzed the factors to which one looks to determine whether someone is an accommodation party:

> Whether a person is an accommodation party is a question of intent. Where the intent of the parties does not appear on the face of the instrument, it must be ascertained in light of the surrounding facts and circumstances. In seeking to ascertain the intent of the parties, most courts have adopted some form of the "purpose" and "proceeds" tests. Under the "purpose" test, inasmuch as an accommodation party must have signed the instrument for the purpose of lending his

name to another party to it, whether the creditor would have likely refused the primary maker but for the supposed surety's signature is an important factor to consider. In other words, the accommodating party's signature must have been necessary for the primary maker to get the loan. Under the "proceeds" test, the accommodating party cannot receive the primary benefits from the transaction, since this would be inconsistent with the party's status as a mere accommodation party. Other factors to consider are whether the party took place [sic] in negotiations prior to the transaction, and the position of the party's signature on the face of the instrument itself.

*Branch Banking & Trust Co. v. Thompson,* 107 N.C.App. 53, 59–60, 418 S.E.2d 694, 698–99 (internal quotations, citations, and footnotes omitted), *review denied,* 332 N.C. 482, 421 S.E.2d 350 (1992).

The district court held that Cheryl had a real interest in the proceeds of the note that she signed, and therefore that she was not an accommodation party. Indeed, it seems to have been the intent of the parties that Cheryl sign the note as a co-maker, and not as an accommodation party. She signed the promissory note, exactly as James did, on a line under the heading of "Borrower." By signing the note, Cheryl subjected herself to liability on its full amount. James testified that in preparation for the loan, he gave the Bank a joint financial statement, and both of the Harpers signed a joint note and deed of trust.[2] Dodson, the account executive at NationsBank, testified that the loan made to the Harpers was intended to be "a joint loan to the two of them."

Both the face of the promissory note and the intent of the parties support the conclusion that Cheryl was not an accommodation party on the note. Cheryl had a primary interest in the proceeds of the loan made by NationsBank, and she effected a transfer of those proceeds to the Bank by directing that they be applied to cover her husband's debt.

---

**2.** The Harpers owned their house as tenants by the entireties. Thus, under North Carolina law, for one of them to transfer an interest in that property, the other had to join in the transfer.

*See* N.C.G.S. § 39–13.6. This does not mean, however, that Cheryl's signature was also required on the promissory note.

We therefore find that there was a transfer of loan proceeds from Cheryl to Nations-Bank, and that the district court was correct in finding that Cheryl was not an accommodation party.

## IV.

■ In order for a transaction to be considered fraudulent under the relevant provision of the North Carolina fraudulent conveyances statute, the transfer must have been "voluntary." *See Aman*, 165 N.C. at 227, 81 S.E. at 164. A transfer is voluntary if the transferor (here, Cheryl) does not receive reasonably equivalent value for her transfer. *See Burton*, 599 F.Supp. at 1319. The Supreme Court of North Carolina has stated the following regarding what constitutes valuable consideration for the purposes of fraudulent conveyances law:

> A valuable consideration in the law of fraudulent conveyances is not the same as a valuable consideration in the law of contracts.... Mere inadequacy of price is not sufficient to set aside a contract as between two parties.... However, different policy considerations come into play when the transaction involves the interests of a creditor who is not a party to the transaction.... Since the creditor has no control over the amount of consideration which his debtor will accept in relinquishing assets, the law requires that the debtor receive "a *fair* and *reasonable* price...."

*North Carolina National Bank v. Evans,* 296 N.C. 374, 378, 250 S.E.2d 231, 234 (1979).

NationsBank argues that Cheryl received reasonably equivalent value for her transfer of loan proceeds to the Bank because her transfer of funds served to extinguish half of the debt owed by her husband to the Bank.[3] However, if at the time Cheryl made the transfer of funds to NationsBank, her husband did not actually owe any money to the Bank, her transfer would be considered voluntary. That is, if James' $35,000 debt to NationsBank was discharged when James was discharged in bankruptcy, then at the

time the Harpers transferred their loan proceeds to the Bank (which was after the time of discharge), no debt was owed, and Cheryl did not receive valuable consideration for her transfer.

■ A debt arising before the date of the filing of a Chapter 7 petition in bankruptcy is discharged when the debtor is discharged in bankruptcy. *See* 11 U.S.C. §§ 301, 727(b). James filed for relief in bankruptcy on December 18, 1989, and thus any debts that arose before that date were discharged when he was discharged in bankruptcy on April 18, 1990. If James' $35,000 debt to NationsBank arose before he filed for relief in bankruptcy, the debt was discharged in April 1990, and any transfer of funds made by Cheryl after April 1990 to pay back the nonexistent debt would be unsupported by consideration and thus voluntary. However, if the debt arose after James filed for bankruptcy relief, it was not eradicated by his discharge and still existed when the Harpers transferred their loan proceeds to NationsBank.

The bankruptcy court held that James' debt to the Bank arose on July 24, 1989 (before James' bankruptcy petition was filed), when James deposited the $35,000 check into his trust account and NationsBank gave him a credit for that amount. The court thus concluded that the debt was discharged in April 1990. The district court affirmed the bankruptcy court's finding. NationsBank argues, however, relying on North Carolina law, that the debt arose on February 27, 1990 (after the petition was filed), when NationsBank first received notice of the forgery from the American Bank of the South. It is NationsBank's contention, therefore, that the debt was not discharged in April 1990.

In finding that James' debt to Nations-Bank arose before his petition in bankruptcy was filed, the district court relied on the definition of the word "debt" in the Bankruptcy Code. 11 U.S.C. § 101(12) defines "debt" as "liability on a claim." 11 U.S.C. § 101(4)(A) further defines "claim" as a

---

3. NationsBank also argued below that Cheryl received valuable nonmonetary consideration for her transfer of funds to the Bank, because she thereby helped James to avoid further criminal

prosecution. The district court rejected the argument. Since NationsBank does not raise the issue of non-monetary consideration on appeal, we will not address it.

"right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured...." However, the Bankruptcy Code does not define "right to payment." The district court decided that NationsBank had a right to payment on the forged check as of July 24, 1989 when the fraudulently endorsed check was deposited, and thus that the debt arose before the petition was filed.

■ NationsBank, relying on the Third Circuit case of *In re M. Frenville Co., Inc.*, 744 F.2d 332 (3d Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985), contends that the time at which a right of payment arises is a state law issue. The court in *Frenville* stated, in the context of determining whether a claim arose pre-petition for purposes of the automatic stay provision of the Bankruptcy Code, that "[a]lthough 'claim' is defined by § 101(4), the Code does not define when a right to payment arises. Thus, while federal law controls which claims are cognizable under the Code, the threshold question of when a right to payment arises, absent overriding federal law, 'is to be determined by reference to state law.'" *Id.* at 337 (quoting *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946)). However, we have explicitly declined to follow the reasoning of *Frenville*, stating, "We have found no court outside the Third Circuit which has followed the reasoning and holding of *Frenville*. All of the cases coming to our attention which have considered the issue have declined to follow *Frenville*'s limiting definition of a claim." *Grady v. A.H. Robins Co., Inc.*, 839 F.2d 198, 201 (4th Cir.), *cert. dismissed*, 487 U.S. 1260, 109 S.Ct. 201, 101 L.Ed.2d 972 (1988). We thus adhere to our view in *Grady* that to determine when a claim arises for bankruptcy purposes, reference is to be made to federal bankruptcy law rather than to state law.

■ The term "claim" in the bankruptcy statute is meant to be read broadly. *Id.* at 200. Although NationsBank was initially unaware of the forged endorsement and did not attempt to recover payment from James until it was notified of the forgery by another bank, it had a claim against James for $35,000 from the time that he deposited the fraudulently endorsed check and NationsBank credited his account based on that forgery. NationsBank argues that because it did not know of the forgery until it was notified by the American Bank of the South, there was no claim or right to payment until that time. However, the Bankruptcy Code clearly states that even a contingent right to payment constitutes a "claim." *See* 11 U.S.C. § 101(4)(A). The act that gave rise to NationsBank's right to payment was the deposit of the check by James, pursuant to which NationsBank gave him a credit. Therefore, NationsBank had a claim as soon as James deposited the fraudulently endorsed check into the Bank, the recovery of which was contingent upon the receipt of notice of the forgery. Notice from the American Bank of the South merely made NationsBank aware that it had had for some time a claim against James. The district court was correct in determining that the claim in the instant case arose pre-petition, and therefore was discharged in bankruptcy. Since James' debt arose pre-petition and was discharged in bankruptcy, the debt no longer existed when Cheryl transferred funds to NationsBank, and she was not given fair consideration for her transfer. Her transfer of funds to the Bank was therefore voluntary under the North Carolina fraudulent conveyances statute.[4]

---

4. The case of *In re Rosenfeld*, 23 F.3d 833 (4th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 200, 130 L.Ed.2d 131 (1994), does not dictate a contrary result. In *Rosenfeld*, we held that a claim for post-petition housing cooperative dues arose at the time the dues were assessed, not at the time the contract for housing was made. *Id.* at 838. The obligation to pay dues in that case arose as a result of the debtor's continued ownership of the property after bankruptcy; in other words, the dues arose due to a post-petition act by the debtor. Here, however, there was no act performed by James, other than the deposit of the check containing the forged endorsement (which occurred prior to the filing of his petition), that was necessary to give rise to NationsBank's claim against James. The notice that was received by NationsBank from the American Bank of the South merely served to make NationsBank aware of its claim; it did not itself create the claim.

## V.

 The bankruptcy court made a further finding, affirmed by the district court, that Cheryl's transfer of funds in the instant case rendered her insolvent because at the time of the transfer, "she did not retain property fully sufficient to pay her existing debts." NationsBank contends that this finding was clearly erroneous. In support of its point, the Bank argues that the financial statement provided by the Harpers to NationsBank in March 1990 reflected that the Harpers had a net worth of $36,265.00, which would have covered their debt of $35,000. In addition, a financial statement in May 1991 reflected a net worth of $85,376.59. The Bank also points out that Cheryl continued to pay her creditors for two years after the loan transaction took place and before she filed for relief in bankruptcy.

Cheryl testified that on June 14, 1990, her liability exceeded her assets. In addition, James testified that he had listed $14,000 in contingent earnings on the statement of March 19, 1990, which he never received because the case on which his contingency fee was based was reversed on appeal. James additionally testified that the May 1991 financial statement was not accurate. James A. Ross, II, a certified public accountant, testified that Cheryl "had not retained adequate assets to pay her debts before and after this questioned transaction."

NationsBank argues, based primarily on the two financial statements submitted by the Harpers, that Cheryl was not insolvent at the time of the transfer. However, both of the financial statements on which the Bank relies were shown at trial to be unreliable, and expert testimony was presented regarding Cheryl's state of insolvency. The finding of the bankruptcy court that Cheryl was insolvent at the time of the transaction in question was not clearly erroneous.

## VI.

 Cheryl Harper transferred loan proceeds in the instant case that were intended to cover a debt that had been incurred by her husband but that was, at the time of the transfer, nonexistent. She did not retain funds sufficient to pay her debts. We therefore hold that the transfer of funds was fraudulent under North Carolina law, and we affirm the ruling of the bankruptcy court, as affirmed by the district court, ordering NationsBank to pay $17,797 to the Trustee in bankruptcy of Cheryl Harper's estate.

*AFFIRMED.*