**In re Norton Charles WEINSTEIN and Joyce Weinstein, Debtors.**

**FIRST FEDERAL BANK OF CALIFORNIA, Appellant,**

v.

**Norton Charles WEINSTEIN and Joyce Weinstein, Appellees.**

**BAP No. CC–96–2023–RuJO. Bankruptcy No. LA94–38144–SB.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Nov. 19, 1997.

Decided Nov. 10, 1998.

Mark Robbins, Epport & Richman, Los Angeles, CA, for First Federal Bank of California.

Raymond H. Aver, Fainsbert, Mase & Snyder, Los Angeles, CA, for Norton and Joyce Weinstein.

Before: D. RUSSELL [1], JONES and OLLASON, Bankruptcy Judges.

## OPINION

RUSSELL, Bankruptcy Judge.

Appellant First Federal Bank of California appeals an order by the bankruptcy court confirming appellees Norton and Joyce Weinstein's First Amended Plan of Reorganization. We **AFFIRM**.

## I. FACTUAL STATEMENT

In March 1991, appellant First Federal Bank of California (the "Bank") loaned appellees Norton and Joyce Weinstein ("Debtors") $1,000,000 with interest at a rate of 10.463 percent per annum. The loan was secured by a first deed of trust on Debtors' residence, an ocean front condominium located in Santa Monica, California (the "residential property"). In February 1994, Debtors defaulted on their monthly loan payments. On July 29, 1994, Debtors filed a petition for relief under Chapter 11 of the Bankruptcy Code.[2]

The Bank later filed a motion for relief from the automatic stay. Following a hearing on the motion, the bankruptcy court issued an order requiring Debtors to make "adequate protection" payments of $7,000 per month to the Bank commencing on April 1, 1995. These payments continued until the Debtors' plan of reorganization was confirmed in October 1996. Eventually, $98,000 in total payments were made.

The Bank's total claim for its loan is $1,012,700.71. On May 22, 1996, the bankruptcy court held an evidentiary hearing to determine the fair market value of the residential property. It concluded that the value of the property as of July 1994 was $850,000. Thereafter, the Bank made an election under § 1111(b)(2) of the Code to have its entire claim treated as fully secured.

The Debtors proposed their First Amended Plan of Reorganization (the "Plan") to creditors in July 1995 and the Bank filed various objections to the Plan. At the confirmation hearing, the bankruptcy court found that there had been no change in the value of the residential property between the date the petition was filed and the date the Plan was to be confirmed. Its value remained $850,000. The court also held that Debtors were entitled to credit the $98,000 in postpetition, preconfirmation payments to reduce the Bank's allowed secured claim of $850,000 to $752,000. The court further held that the residential property, also used as Debtors' business office, was necessary for the Debtors' effective reorganization and that the Plan complied with the requirements of 11 U.S.C. §§ 1129(a) and (b). The Plan was confirmed on October 28, 1996 over the Bank's objections.

The order confirming the Plan addressed the treatment of the Bank's claim. Debtors are required to pay the Bank $752,000 with interest of 9.4 percent per annum in monthly installments of $6,268.43 commencing in July 1996 and continuing for 120 months. These payments, however, are based upon a 30 year amortization. In June of 2006, any unpaid principal and interest owing on the $752,000 adjusted secured claim is to be paid in full. Additionally, the confirmation order requires that if the fair market value of the residential property exceeds $850,000 at the end of the 120 months or at the time the property is sold, whichever occurs first, the Bank must receive any increase in the property's value up to $162,700.71.

The Bank appeals the order confirming the Plan.

## II. ISSUES ON APPEAL

1. Whether the bankruptcy court properly applied the Bank's election under 11 U.S.C. § 1111(b)(2).

---

[1]. Honorable David E. Russell, Chief Bankruptcy Judge for the Eastern District of California, sitting by designation.

[2]. Unless otherwise indicated, all statutory references and references to "Chapter" or "Code" are to the provisions of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101–1330.

2. Whether the bankruptcy court erred in applying Debtors' $98,000 in postpetition, preconfirmation payments to reduce the secured, rather than unsecured, portion of the Bank's claim.

## III. STANDARD OF REVIEW

The bankruptcy court's findings of fact are reviewed for clear error and its conclusions of law are reviewed de novo. *In re Candland*, 90 F.3d 1466, 1469 (9th Cir.1996) (citation omitted); Fed.R.Bankr.P. 8013.

■ Whether a reorganization plan properly applies an undersecured creditor's § 1111(b)(2) election involves interpretation and application of the Bankruptcy Code and is thus a question of law reviewed de novo. *See United States Trustee v. Garvey, Schubert & Barber (In re Century Cleaning Servs., Inc.)*, 215 B.R. 18, 20 (9th Cir. BAP 1997); *Wade v. Bradford*, 39 F.3d 1126, 1129 (10th Cir.1994).

■ Whether postpetition, preconfirmation payments made to an undersecured creditor whose collateral did not depreciate should be credited towards reducing the secured or unsecured portion of the creditor's claim is also a question of law which we review de novo. *See In re Spacek*, 112 B.R. 162, 165 (Bankr.W.D.Tex.1990).

## IV. DISCUSSION

### A. Preliminary Matters

As a preliminary matter, we dispose of several ancillary arguments raised by the parties.

First, Debtors claim that the Bank's appeal is moot. They argue that the Plan is substantially consummated so that it could not be set aside without jeopardizing the entire reorganization.

■ Mootness is a judicial doctrine with the general rule that the occurrence of events which prevents an appellate court from granting effective relief renders an appeal moot. *Algeran, Inc. v. Advance Ross Corp.*, 759 F.2d 1421, 1424 (9th Cir.1985). An appeal is dismissed as moot if a stay of an order confirming a plan is not obtained and the plan of reorganization is substantially consummated[3] so that effective relief is no longer available. *Baker & Drake, Inc. v. Public Serv. Comm'n Nev. (In re Baker & Drake, Inc.)*, 35 F.3d 1348, 1351 (9th Cir. 1994) (citations omitted); *Connecticut General Life Ins. Co. v. Hotel Assocs. of Tucson (In re Hotel Assocs. of Tucson)*, 165 B.R. 470, 474 (9th Cir. BAP 1994). Here, the Bank did not obtain a stay of the Plan pending this appeal.

■ Whether a reorganization plan is substantially consummated turns on the facts of each case. *Hotel Assocs. of Tucson*, 165 B.R. at 474. Once a reorganization plan is substantially consummated, there is often a comprehensive change in circumstances so as to render it impractical for the appellate court to review the merits of the plan. *See Algeran*, 759 F.2d at 1423. However, the fact that a plan is substantially consummated and that the appellant failed to obtain a stay pending appeal does not, by itself, render an appeal moot. *See Baker & Drake*, 35 F.3d at 1351. The appellate court should still consider whether it can grant effective relief. *Id.* If the court can fashion relief by simply ordering additional disbursements of money by one of the parties on appeal, the appeal is not moot. *See Id.; Spirtos v. Moreno (In re Spirtos)*, 992 F.2d 1004, 1007 (9th Cir.1993); *Salomon v. Logan (In re Int'l Envtl. Dynamics, Inc.)*, 718 F.2d 322, 326 (9th Cir. 1983).

Here, pursuant to the Plan, Debtors have returned various pieces of real property to several secured creditors discharging these secured claims in full, and have made approximately $40,000 in cash payments to the administrative and unsecured claimants. Debt-

---

3. The Bankruptcy Code defines substantial consummation as:
   (A) transfer of all or substantially all of the property proposed by the plan to be transferred;
   (B) assumption of the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
   (C) commencement of distribution under the plan.
   11 U.S.C. § 1101(2).

ors argue that the property transfers and cash payments can not be undone without adversely affecting both them and the various creditors. Thus, they claim, it would be impossible to unscramble this case if the order confirming the Plan were reversed on appeal. We disagree.

■ A practical and equitable remedy can still be fashioned in this case. The Bank's primary claims on appeal are that the bankruptcy court erred in crediting the $98,000 in postpetition, preconfirmation payments to reduce the secured, rather than unsecured, portion of its claim and that it misapplied the Bank's § 1111(b)(2) election. The Bank, therefore, merely requests that Debtors be required to pay it more money. Since the remedy requested would simply require one of the parties on appeal to pay the other party additional money, the appeal is not moot. If the Bank prevails on its claims, we would not require the other secured creditors to return their collateral nor would the administrative or unsecured claimants have to disgorge the payments they have received.

Debtors, however, counter that if they had to pay more money to the Bank than currently required, it would impair their ability to continue making Plan payments to several other creditors. This argument is unpersuasive because it is based on the false premise that Debtors would have to begin making any additional payments to the Bank immediately. Debtors could be required to pay the Bank beyond the present 120 month Plan term or increase their payments after payments to other creditors have ended.

Second, the Bank makes several equitable arguments claiming that it would subvert the purposes of Chapter 11 to allow the Debtors to reorganize their consumer debt. Specifically, the Bank claims that Debtors abuse the

Chapter 11 process by filing a Plan that essentially seeks to strip down the mortgage on their personal residence. Thus, the Bank argues, the Plan is not filed in good faith as required by § 1129(a)(3). We disagree.

■ In *Toibb v. Radloff*, 501 U.S. 157, 161, 111 S.Ct. 2197, 2199, 115 L.Ed.2d 145 (1991), the Supreme Court expressly rejected the argument that individual debtors could not file a petition under Chapter 11. The Court found nothing in the language of the Bankruptcy Code which precluded individuals from reorganizing consumer debt under Chapter 11. *Id.* However, even prior to the *Toibb* decision, we permitted modification of home mortgages in Chapter 11. *See Warner v. Universal Guardian Corp. (In re Warner)*, 30 B.R. 528 (9th Cir. BAP 1983). In *Warner*, a bank sought to foreclose on the deed of trust it held on the debtors' home. The debtors filed a Chapter 11 petition and expressly designed a reorganization plan to save their home. In that case, we stated that there was "nothing ... in the Code prohibiting the use of Chapter 11 to debtors seeking to save their family home from foreclosure." *Id.* at 529. Other courts have similarly held that individual debtors could strip down or otherwise modify their residential mortgage under Chapter 11.[4] *See, e.g., Wade*, 39 F.3d at 1129; *In re Kennedy*, 158 B.R. 589, 595–97 (Bankr.D.N.J.1993).

■ Furthermore, the Bank's assertion that the Plan is primarily intended to strip down its mortgage is simply incorrect. While the Bank holds the largest claim, the Plan also addresses the claims of various other secured, unsecured, and tax creditors. The Plan requires Debtors to make over $374,000 in payments and relinquish various pieces of real property to other secured creditors. The Plan also requires them to make

4. Modification of a home mortgage in Chapter 11 is no longer permitted. Section 1123(b)(5) now states that a Chapter 11 plan may "modify the rights of holders of secured claims other than a claim secured only by a security interest in real property that is the debtor's principal residence...." 11 U.S.C. § 1123(b)(5). Section 1123(b)(5) became effective on October 22, 1994, as part of the Bankruptcy Reform Act of 1994.

*See* Pub.L. No. 103–394, § 206, 108 Stat. 4106, 4123 (1994). Here, Debtors' petition was filed in July 1994. Congress has said that § 1123(b)(5) is not to be applied retroactively. *See Id.* § 702, 108 Stat. at 4150. Thus, our prior practice of permitting modification of home mortgages in Chapter 11 for debtors filing bankruptcy before October 22, 1994 applies in this case.

significant payments to the tax claimants and unsecured creditors. Thus, the Plan clearly intends to accomplish more than just a strip down of the Bank's lien.[5]

Third, citing *In re Kornhauser*, 184 B.R. 425 (Bankr.S.D.N.Y.1995), and other cases, the Bank argues that the Plan should not have been confirmed because Debtors' residential property is not necessary for their effective reorganization. In *Kornhauser*, the bankruptcy court determined that for purposes of lifting the automatic stay under Code § 362(d)(2), the mere fact that a debtor needs a home to survive does not make a residence *per se* necessary for an effective reorganization. *Id.* at 428.

■■■■ Here, however, the Bank fails to identify any provision of Chapter 11 which requires a bankruptcy court to find that property is necessary for an effective reorganization before it can confirm a Chapter 11 plan.[6] Section 1129, which sets forth the requirements for confirming a Chapter 11 plan, does not require such a finding. 11 U.S.C. § 1129. The Bank's attempt to implant such a requirement in Chapter 11 is not supported by either the Code or case law. We refuse to create such a requirement now.

## B. Application Of The § 1111(b)(2) Election

Turning to the more substantive claims, the Bank first argues that the bankruptcy court misapplied its election under § 1111(b)(2) of the Code. In order to understand the effect of the election on an undersecured creditor subject to a cram down, we must examine the interrelationship between §§ 506, 1111, and 1129.

■■■ First, we consider the effect of subsections (a) and (d) of § 506 on the claim of a creditor not making the § 1111(b)(2) election. In relevant part, § 506(a) provides:

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.

11 U.S.C. § 506(a). Under § 506(a), the total claim of an undersecured creditor is bifurcated into two claims, a secured claim equal to the value of the collateral[7] and an unsecured claim equal to the remainder of the obligation owing to the creditor as of the

---

5. On appeal, the Bank also makes various arguments to the effect that the bankruptcy court should have applied the principles of Chapter 13 if Debtors wished to reorganize their personal debt. However, Debtors secured and unsecured debts far exceeded the statutory limitations for filing a Chapter 13 petition. In July 1994, when this petition was filed, to file a Chapter 13, the aggregate secured debt could not exceed $350,000. *See* 11 U.S.C. § 109(e) (1994). The Bank's secured claim alone is $850,000. Even under today's higher allowance for secured debt ($750,000), Debtors could not have filed a Chapter 13 petition. *See* 11 U.S.C. § 109(e) (1997). Moreover, individuals can not be forced to involuntarily proceed by way of Chapter 13. *See Toibb*, 501 U.S. at 165–66, 111 S.Ct. at 2202. Thus, the bankruptcy court correctly refused to apply Chapter 13 principles in this Chapter 11 case.

6. Whether a particular property is necessary for an effective reorganization is normally considered when a creditor seeks relief from the automatic stay. *See* 11 U.S.C. § 362(d)(2)(B) (relief from stay to be granted where property has no equity and is not necessary for an effective reorganization); *In re Wilks*, 123 B.R. 555 (Bankr. W.D.Tex.1991) (determination of whether a residence is necessary for an effective Chapter 11

reorganization is made during the relief from stay stage). Here, the Bank's relief from stay motion was denied in 1995. An order denying relief from the automatic stay is a final appealable order. *Cimarron Investors v. Wyid Properties (In re Cimarron Investors)*, 848 F.2d 974, 975 (9th Cir.1988); *Centofante v. CBJ Dev., Inc. (In re CBJ Dev., Inc.)*, 202 B.R. 467, 469 (9th Cir. BAP 1996). There is no indication the Bank ever appealed the order denying relief from stay and the deadline for filing such an appeal has long since passed. *See* Fed.R.Bankr.P. 8002(a). Thus, whether the bankruptcy court properly denied relief from stay is not an issue in the present appeal.

7. The words "to the extent of the value of such creditor's interest in the estate's interest in such property" found in § 506(a) are words of art. If the estate owns the property, then the extent of the value of the estate's interest in such property is obviously the value of the property. If the creditor's claim exceeds the value of the property, then the creditor's interest in the estate's interest in the property (i.e., the creditor's lien) is likewise limited to the value of the property.

petition date. *U.S. v. Ron Pair Enter., Inc.,* 489 U.S. 235, 239 & n. 3, 109 S.Ct. 1026, 1029 & n. 3, 103 L.Ed.2d 290 (1989).

With exceptions not pertinent here, § 506(d) states: "To the extent that a lien secures a claim against the debtor that is not an *allowed secured claim,* such lien is void..." 11 U.S.C. § 506(d) (emphasis added). Thus, § 506(d) operates to strip the undersecured creditor's lien from its unsecured claim, in effect reducing the creditor's lien to the present value of the collateral. *Dever v. I.R.S. (In re Dever),* 164 B.R. 132, 145 (Bankr.C.D.Cal.1994) ("lien-stripping under Section 506(d) is available in Chapter 11") [8]; *accord Jones,* 152 B.R. at 172–77.

With respect to the unsecured portion of the undersecured creditor's claim, the treatment of that claim in bankruptcy would depend on whether the creditor did or did not have recourse. A nonrecourse creditor is one who can "look only to its collateral for satisfaction of its debt and does not have any right to seek payment of any deficiency from a debtor's other assets." *680 Fifth Ave. Assocs.,* 156 B.R. at 732. A recourse creditor "has the right to seek payment of a deficiency in the value of its collateral from the debtor's other assets." *Id.* at 733. Because § 502(b)(1) disallows any claim to the extent that it is unenforceable against the debtor or the debtor's property under any agreement or under applicable nonbankruptcy law, the undersecured creditor with a nonrecourse unsecured claim would not be entitled to a distribution in bankruptcy. *In re Bloomingdale Partners,* 155 B.R. 961, 969 (Bankr. N.D.Ill.1993) (citations omitted).

However, with exceptions not relevant here, § 1111(b)(1)(A) provides a very important benefit to the undersecured creditor holding a nonrecourse claim; it provides that for purposes of the Chapter 11 process, all secured debt shall be allowed or disallowed under § 502 as if it had recourse. *See* 11 U.S.C. § 1111(b)(1)(A); *Bloomingdale Partners,* 155 B.R. at 969. This allows an undersecured creditor holding a nonrecourse claim to receive distribution on both the secured and unsecured portion of its claim. The unsecured portion of its claim is not disallowed in bankruptcy merely because it is nonrecourse under the security agreement or under applicable nonbankruptcy law.[9] Thus, a nonrecourse undersecured Chapter 11 creditor's total claim is bifurcated into secured and unsecured portions, the creditor has the right to vote those two claims separately within two different classes during the vote on the reorganization plan, and is entitled to receive two distributions under that plan, one for each claim. *See Wade,* 39 F.3d at 1129; 4 Norton Bankruptcy Law and

---

8. In *Dewsnup v. Timm,* 502 U.S. 410, 417, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992), the Supreme Court held that § 506(d) does not permit lien stripping in a Chapter 7 bankruptcy. There has been some controversy whether *Dewsnup* also prohibits lien stripping under § 506(d) in Chapter 11. *Compare Blue Pac. Car Wash v. St. Croix County (In re Blue Pac. Car Wash),* 150 B.R. 434 (W.D.Wis.1992) (lien stripping not permitted in Chapter 11), *Taffi v. U.S. (In re Taffi),* 144 B.R. 105, 114 (Bankr.C.D.Cal.1992) (same), *rev'd on other grounds,* 96 F.3d 1190 (9th Cir. 1996) (en banc) *with Dever,* 164 B.R. at 145 (§ 506(d) does permit lien stripping).

In *Dewsnup,* the Supreme Court reached its conclusion based largely on the fact that under pre-Code law real property liens survived bankruptcy unaffected and that there was no evidence Congress intended to change this practice when it enacted the Bankruptcy Code. 502 U.S. at 417–18, 112 S.Ct. at 778. However, the *Dewsnup* Court suggested that its holding was limited to the facts of the case and that its rationale may not be applicable in reorganization cases. *See*

502 U.S. at 418–19, 112 S.Ct. at 779. This is evidenced by the Court's acknowledgment that pre-Code law permitted lien stripping in reorganization proceedings. *Id.* (citing various Bankruptcy Act provisions); *see also Harmon v. U.S.,* 101 F.3d 574, 582 n. 4 (8th Cir.1996) (same). Since *Dewsnup,* several courts have held that prohibiting lien stripping in Chapter 11 would render §§ 1111(b) and 1129(b) superfluous. *See Wade,* 39 F.3d at 1129 (citations omitted); *Dever,* 164 B.R. at 145; *In re 680 Fifth Ave. Assocs.,* 156 B.R. 726, 732 n. 7 (Bankr.S.D.N.Y.), *aff'd,* 169 B.R. 22 (S.D.N.Y.1993), *aff'd,* 29 F.3d 95 (2nd Cir.1994); *In re Jones,* 152 B.R. 155, 173 (Bankr. E.D.Mich.1993). We agree and reject the argument that lien stripping under § 506(d) is not permitted in Chapter 11.

9. In California, holders of deeds of trust given to secure the repayment of loans used to pay all or part of the purchase price of the borrower's residence have a nonrecourse claim. *See* Cal. Code Civ.P. § 580b (1997). Whether the Bank's loan was for this purpose is unclear from the record.

PRACTICE 2D § 89:2 (W. Norton, ed., 1997) (hereafter "NORTON").

■ We now consider the effect of the § 1111(b)(2) election. With exceptions not relevant here, § 1111(b)(2) provides:

> If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

11 U.S.C. § 1111(b)(2). When an undersecured creditor makes the § 1111(b)(2) election, its claim is not altered by §§ 506(a) and (d). By making the election, the creditor foregoes its unsecured, deficiency claim. *Bloomingdale Partners*, 155 B.R. at 969–70 ("The 'election' is the waiver by the affected class ... of its § 506(a) unsecured claim."). Instead, its total claim is treated as the allowed secured claim for purposes of the Chapter 11 plan confirmation process. *See Boston Post Road Ltd. Partnership v. FDIC (In re Boston Post Road Ltd. Partnership),* 21 F.3d. 477, 480 & 483 (2nd Cir.1994), *cert. denied,* 513 U.S. 1109, 115 S.Ct. 897, 130 L.Ed.2d 782 (1995); *In re 500 Fifth Ave. Assocs.,* 148 B.R. 1010, 1017 (Bankr.S.D.N.Y. 1993); *Bloomingdale Partners,* 155 B.R. at 974. Nevertheless, because of the Code's artful language, an electing creditor's allowed secured claim is not treated the same as a fully secured claim. Rather, the § 1111(b)(2) election can be understood as giving rise to an "election claim" equal to the total claim but allotted special treatment for purposes of the plan confirmation process.[10]

■ The significance of the § 1111(b)(2) election becomes apparent when the treatment required by § 1129(b)(2) of the respective claims of the electing and nonelecting undersecured creditors are compared. Debtors use § 1129(b)(2) to "cram down" a creditor class, such as the Bank here, when it objects to its treatment under a reorganization plan. 11 U.S.C. § 1129(b)(1); *Travelers Ins. Co. v. Bryson Properties, XVIII (In re Bryson Properties, XVIII),* 961 F.2d 496, 500 n. 3 (4th Cir.), *cert. denied,* 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992). That section permits the bankruptcy court to confirm a reorganization plan over the secured creditor's objection if one of the three conditions of § 1129(b)(2)(A) is met. *See* 11 U.S.C. §§ 1129(b)(2)(A)(i)–(iii). In this case, § 1129(b)(2)(A)(i) is the applicable provision. This section states that with respect to a class of secured claims, the proposed plan must provide:

> (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

11 U.S.C. § 1129(b)(2)(A)(i). Thus under subsection (I) of § 1129(b)(2)(A)(i), the objecting undersecured creditor must retain a lien on its collateral in an amount equal to "the allowed amount of such claim." Under subsection (II), it must receive cash payments the total sum of which is at least equal to this allowed amount, and these cash payments must have a value equal to the creditor's interest in the estate's interest in the property as of the effective date of the plan (i.e., a present value).[11] *See United Savings*

---

**10.** By exercising the § 1111(b)(2) election, the undersecured creditor's total claim is treated as a single secured claim for purposes of plan distribution and plan voting. The electing undersecured creditor thus gives up any distribution it might receive on its separate unsecured claim under a reorganization plan and foregoes its right to vote on the plan as an unsecured creditor. *See Wade,* 39 F.3d at 1129; *Boston Post Road,* 21 F.3d at 480; 4 NORTON § 89:4.

**11.** "Present value includes 'the time value of money.'" *Bryson Properties, XVIII,* 961 F.2d at 500 n. 4 (quoting *In re S.E.T. Income Properties, III,* 83 B.R. 791, 793 (Bankr.N.D.Okla.1988)). A stream of payments to be received in the future has less value than if that money were paid today. The amount of the reduction is the discount. *See Id.* Therefore, by requiring that interest at an appropriate discount rate be paid on the unpaid portion of the secured claim, the creditor receives the present value of its claim. The court determines the appropriate discount rate based upon a variety of considerations. *Id.* In this case, the Bank does not challenge the rate of interest it is receiving under the Plan.

*Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 377, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988) (hereafter *Timbers* ) (noting that § 1129(b)(2)(A)(i)(II) requires providing the present value of the collateral); *Bryson Properties, XVIII,* 961 F.2d at 500. As we have noted, the undersecured creditor's interest in the estate's interest in the property is equal to the value of the creditor's collateral. *See, supra,* footnote 7.

Without the § 1111(b)(2) election, the lien of the undersecured creditor is stripped down by § 506(d) to the amount of the allowed secured claim, which is, by operation of § 506(b), equal to the value of the collateral. *See Jones,* 152 B.R. at 173–74. The cram down requirement of § 1129(b)(2)(A)(i)(I) that the secured creditor retain its lien "to the extent of the allowed amount" of its secured claim is thus satisfied by the retention of the stripped down lien. Subsection (II) of § 1129(b)(2)(A)(i) is satisfied if the objecting undersecured creditor receives cash payments aggregating to at least the present value of the collateral as of the effective date of the plan. *Wade,* 39 F.3d at 1129; *Dever,* 164 B.R. at 142. If the cash payments were to be made after the effective date, the reorganization plan would have to provide for the payment of interest to make those payments equal to present value. The creditor would also be entitled to receive payment on its separate unsecured claim to the extent provided by the confirmed plan.

■■■ On the other hand, when an undersecured creditor makes the § 1111(b)(2) election, its allowed secured claim is equal to its total claim rather than the value of the collateral. In order for a reorganization plan to now comply with the cram down requirements of § 1129(b)(2)(A)(i)(I), the electing creditor must retain a lien equal to the total amount of its claim. The lien is not stripped down by § 506(d). Subsection (II) of § 1129(b)(2)(A)(i) guarantees an electing creditor a stream of payments equal to its total claim. However, the stream of payments need only have a present value "of at least the value of such holder's interest in the estate's interest in such property," i.e., the value of the collateral. 11 U.S.C.

§ 1129(b)(2)(A)(i)(II). In other words, the present value of the electing creditor's stream of payments need only equal the present value of the collateral, which is the same amount that must be received by the nonelecting creditor, but the sum of the payments must be in an amount equal at least the creditor's total claim. *See Wade,* 39 F.3d at 1129 (with a § 1111(b)(2) election, the undersecured creditor "must be paid the full amount of his claim over time, so long as the present value of such payments equals the value of the collateral."); *John Hancock Mutual Life Ins. Co. v. Route 37 Bus. Park Assocs.,* 987 F.2d 154, 156 n. 4 (3rd Cir.1993); *IPC Atlanta Ltd. Partnership,* 142 B.R. 547, 555 (Bankr.N.D.Ga.1992).

Applying the foregoing principles, in order for the Bank to have its § 1111(b)(2) election properly applied, it must retain a lien on the residential property for its total claim of $1,012,700.71 and must receive a stream of payments with a present value of $850,000 aggregating $1,012,700.71.

■■■ Our review of the Plan, as amended by the confirmation order, indicates that it not only complies with the requirements of § 1129(b)(2)(A)(i), but provides the Bank with *more* than what is required by the § 1111(b)(2) election. As of the Plan's effective date, Debtors had made $98,000 in postpetition, preconfirmation payments. By definition, that $98,000 had a present value of at least $98,000. Therefore, the Bank is entitled to receive an additional stream of payments aggregating no less than $914,700.71 (the initial $1,012,700.71 less the $98,000), whose present value equals $752,000 (the $850,000 value less the $98,000).

■■■ The Plan provides the Bank with payment on the principal balance of $752,000 with fixed interest of 9.4 per cent per annum for a ten year (120 month) term. A stream of payments which will pay an obligation with an appropriate rate of interest over time is equivalent to the present value of that obligation. *See, supra,* footnote 11. Since no interest accrues on the Bank's "allowed secured claim," any payment to the Bank reduces its total claim and its related lien by the amount of the payment. Should the

Debtors attempt to sell the property, they would always have to pay the Bank the unpaid portion of the lien, so the Bank will always receive payments equal to its allowed secured claim.[12]

In addition, the Plan in this case guarantees the Bank at least a portion of any appreciation in the value of the residential property. The Plan requires that if the fair market value of the residential property increases above $850,000 at the end of the 120 months or at the time the residential property is sold, whichever occurs first, Debtors are required to pay the Bank the increase in the value, up to $162,700.71. Thus, the Bank will receive any appreciation in the property up to $162,700.71, which is not required by either §§ 1111(b)(2) or 1129(b)(2)(A).

■■■ On appeal, the Bank does not challenge the fact that it will have received total aggregated payments greater than $1,012,-700.71 and having a present value of $850,-000. Rather, its primary argument is that the election also entitles it to receive a lump sum payment of the unsecured portion of its claim ($162,700.71) at the end of the Plan term. In support of this contention, the Bank quotes from *680 Fifth Ave. Assocs.*, which, in discussing the election, states:

> At confirmation, the debtor must pay the secured creditor either the value of its true secured claim in full, i.e., the value of the collateral, or the value of its true secured

claim over time with interest so that the stream of payments has a present value equal to the true secured claim at confirmation, *plus an amount equal to the unsecured portion of the debt as valued at confirmation without regard to the present value.* At a minimum, the deferred payments must equal the value of the total claim if the creditor makes a § 1111(b)(2) election.

156 B.R. at 733 (emphasis added). The Bank's reliance on this quoted language is misplaced. It does not require that the Bank receive a lump sum payment of its unsecured claim. While ambiguously drafted, the quoted language is more accurately read as merely requiring that the electing creditor receive its "true" secured claim, i.e., the value of its collateral, in full at the time of plan confirmation or in deferred payments with interest so that the present value of the secured claim is provided. The electing creditor should also receive payments on the unsecured portion of its claim without interest, if necessary, so that, at a minimum, the total payments received is equal the creditor's total claim. This is the interpretation of the § 1111(b)(2) election found in other portions of the *680 Fifth Ave. Assocs.* opinion. *See* 156 B.R. at 731 n. 6, 732 n. 7. Read in its entirety, *680 Fifth Ave. Assocs.* clearly supports our interpretation of the § 1111(b)(2) election as applied to a crammed down undersecured creditor.[13]

---

**12.** It is important to remember that the § 1111(b)(2) election does not prevent a debtor from reducing the obligation it owes the undersecured creditor if the debtor retains possession of the collateral during the course of the reorganization. The election, coupled with § 1129(b)(2)(A)(i), merely insures that the objecting creditor receives deferred cash payments equal to the present value of its collateral and in an amount, without interest, equal to its total claim. If the payments stretch over a sufficient period of time, the total payments could just equal the present value of the collateral. *See Bloomingdale Partners*, 155 B.R. at 974 n. 7. The real benefit of the election is that it protects the creditor against a quick sale of its collateral. The amount of the creditor's secured claim may be determined at a time when the value of the collateral is temporarily depressed. Without the election, the debtor could sell the collateral when its value quickly rebounds and net a considerable gain. By making the election, the creditor guards against such an opportunistic sale be-

cause it retains a lien on the collateral equal to the full amount of its claim, albeit without interest. If there is a quick sale, the creditor is entitled to payment on its full claim. Similarly, an electing creditor benefits if there is an appreciation in the value of the collateral and the debtor defaults on its plan payments. *In re Southern Missouri Towing Service, Inc.*, 35 B.R. 313, 314 (Bankr.W.D.Mo.1983). In the event of a default, the electing creditor may enforce its lien to the full amount of its claim, but without interest. *Id.*

**13.** Some courts and commentators have interpreted the quoted language from *680 Fifth Ave. Assocs.* as addressing the treatment of the interest payments that the creditor must make in order to provide the present value of the collateral. *See IPC Atlanta Ltd. Partnership v. Federal Home Loan Mortgage Corp. (In re IPC Atlanta Ltd. Partnership)*, 163 B.R. 396, 398–99 (Bankr. N.D.Ga.1994); Steven R. Haydon, et al., *The 1111(b)(2) Election: A Primer*, 13 Bankr.Dev.J. 99,

## C. Crediting The Debtors' Postpetition, Preconfirmation Payments

The Bank next argues that the bankruptcy court erred in crediting Debtors' $98,000 in "adequate protection" payments to reduce the secured portion, rather than the unsecured portion, of its claim. The bankruptcy court's credit of the $98,000 reduced the Bank's secured claim from $850,000 to $752,-000 so that Debtors' Plan only had to provide the Bank with the present value of $752,000 in order to satisfy § 1129(b)(2)(A)(i).

■■■■ Section 361 of the Code, which addresses adequate protection payments, provides in relevant part:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection must be provided by—
>
> (1) requiring the trustee to make ... periodic cash payments to such entity, to the extent that the stay under section 362 of this title ... results in a decrease in the value of such entity's interest in such property ...

11 U.S.C. § 361(1). Adequate protection is provided to safeguard the creditor against depreciation in the value of its collateral during the reorganization process. See Paccom Leasing Corp. v. Deico Elecs., Inc. (In re Deico Elecs., Inc.), 139 B.R. 945, 947 (9th Cir. BAP 1992). If the value of the collateral decreases, the creditor is entitled to cash payments so that the value of its interest in the collateral remains constant. 11 U.S.C. §§ 362(d)(1) and 361(1); see also In re Addison Properties Ltd. Partnership, 185 B.R.

766, 769 (Bankr.N.D.Ill.1995). Thus, the amount by which the collateral depreciates is the amount of adequate protection to which the secured creditor is entitled.[14] Deico Elecs., 139 B.R. at 947. As the Supreme Court explained in Timbers, adequate protection payments cannot be used to compensate the creditor for lost interest or to provide lost opportunity costs. 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740.

■■■■ Characterizing the $98,000 in payments made in this case as being for adequate protection, as the Bank does, is inaccurate because there was no depreciation in the value of the Bank's collateral. Where there is no depreciation, there is no entitlement to adequate protection payments. See Confederation Life Ins. Co. v. Beau Rivage Ltd., 126 B.R. 632, 640 (N.D.Ga.1991). The majority of courts have held that payments intended to provide adequate protection should be credited toward reducing the secured portion of the creditor's total claim where there is no depreciation in the value of the collateral. See Spacek, 112 B.R. at 165 (concluding that applying preconfirmation payments towards the unsecured portion of the claim is an unauthorized transfer under 11 U.S.C. § 549); In re B & B West 164th Street Corp., 147 B.R. 832, 840–41 (Bankr.E.D.N.Y.1992) (same); In re Immenhausen Corp., 164 B.R. 347, 351–52 (Bankr.M.D.Fla.1993); In re Reddington/Sunarrow Ltd. Partnership, 119 B.R. 809, 813 (Bankr.D.N.M.1990); John Fabick Tractor Co. v. Maun (In re Maun), 95 B.R. 94, 96 (Bankr.S.D.Ill.1989); In re Can-

125 n. 101 (1996) This reading of 680 Fifth Ave. Assocs. examines whether the interest payments that are made to provide the present value of the collateral can also be counted towards reducing the total claim. Id. In other words, does the interest a debtor pays on its deferred cash payments for purposes of providing present value serve double duty to also reduce the creditor's total claim? As explained above, this misinterprets the 680 Fifth Ave. Assocs. Opinion.

Nevertheless, we believe that the interest payments made to provide the present value of the collateral must also be applied to reduce the total claim to be paid. See Bloomingdale Partners, 155 B.R. at 974; 8 COLLIER ON BANKRUPTCY ¶ 1129.05[2][a][i][B] (15th ed. rev.1997); David E. Epstein, et al., BANKRUPTCY § 10–27, at 52–53

(West 1992). This result gives effect to the plain language of § 1129(b)(2)(A)(i) which merely requires that in a cram down, the creditor making the § 1111(b)(2) election receive a stream of payments equal to its total claim and with a present value equal to the value of the collateral. Requiring anything more would be an unwarranted and unsupportable extension of the statutory requirements of § 1129(b)(2)(A).

14. Where a creditor makes the § 1111(b)(2) election, it is entitled to adequate protection only to the extent of the value of the collateral, and not to the extent of the creditor's total claim. See 124 CONG.REC. H32,395 (remarks of Rep. Edwards), reprinted in 1978 U.S.C.C.A.N. at 6444; 124 CONG.REC. S33,995 (remarks of Sen. DeConcini), reprinted in 1978 U.S.C.C.A.N. at 6513.

*averal Seafoods, Inc.,* 79 B.R. 57, 58–59 (Bankr.M.D.Fla.1987).

■ Legal commentators considering the question have reached a similar conclusion. *See* 3 COLLIER ON BANKRUPTCY ¶ 361.03[2][a] (because adequate protection payments replace the lost value of collateral, "the better approach is to credit the payments against the secured claim rather than the unsecured claim"); David Gray Carlson, *Adequate Protection Payments And The Surrender of Cash Collateral In Chapter 11 Reorganization,* 15 CARDOZO L. REV. 1357, 1372 (1994) (adequate protection payments should reduce the secured claim and the total claim; the unsecured claim unaffected by adequate protection payments). We adopt the majority view and conclude that postpetition, preconfirmation payments made on nondepreciating collateral must be allocated to reduce the secured portion of the creditor's claim.

■ Moreover, an undersecured creditor not making the § 1111(b)(2) election is merely entitled to receive a pro rata distribution on its unsecured claim. *Cf. Fairfield Exec. Assocs. v. Hyperion Credit Capital Partners, L.P. (In re Fairfield Exec. Assocs.),* 161 B.R. 595, 600 n. 6 (D.N.J.1993) (unsecured claims generally comprise one class because "they are claimants of equal legal rank entitled to share pro rata") (citations omitted). Applying postpetition, preconfirmation payments to reduce the unsecured claim would give the undersecured creditor an unwarranted bonus. The undersecured creditor would retain its full secured claim through the reorganization, which the debtor would have to pay, and receive payments on its unsecured claim outside any reorganization plan and without having to share pro rata with the other unsecured creditors. Payments intended to provide adequate protection are not meant to improve the undersecured creditor's position in relation to other creditors. *See Redding-ton/Sunarrow Ltd. Partnership,* 119 B.R. at 814. Permitting such a bonus would be akin

to providing the undersecured creditor with interest or lost opportunity costs which is expressly prohibited by *Timbers.*[15] *Id.* at 813.

In this case, the Bank gave up the right to receive any distribution on the unsecured portion of its claim by making the § 1111(b)(2) election. *See, supra,* footnote 10. Therefore, providing the Bank with any payment on its unsecured claim is simply not permissible. Accordingly, the bankruptcy court properly credited the $98,000 in postpetition, preconfirmation payments to reduce the secured portion of the Bank's claim.

■ Finally, we consider Debtors claim that the Bank's appeal is frivolous and that they should be awarded costs. Bankruptcy Rule 8020 provides that the Panel may award "just damages and single or double costs" to an appellee if an appeal is frivolous. Fed.R.Bankr.P. 8020. This rule is modeled after Federal Rule of Appellate Procedure 38 and cases examining appellate rule 38 guide us in determining when an appeal is deemed frivolous for purposes of Fed. R.Bankr.P. 8020. *See* Fed.R.Bankr.P. 8020 Advisory Committee's Note. Under Federal Rule of Appellate Procedure 38, a frivolous appeal is one where the result is obvious or the appellant's arguments are wholly without merit. *St. Paul Fire & Marine Ins. Co. v. Fort Vancouver Plywood Co. (In re Brazier Forest Prods., Inc.),* 921 F.2d 221, 224 (9th Cir.1990); *Hammer v. Drago (In re Hammer),* 112 B.R. 341, 347 (9th Cir. BAP 1990), *aff'd,* 940 F.2d 524 (9th Cir.1991); *Burkhart v. FDIC (In re Burkhart),* 84 B.R. 658, 661 (9th Cir. BAP 1988).

■ We decline to impose sanctions in this appeal. Considered in their entity, the Bank's arguments, while not well taken, are not so wholly without merit as to warrant sanctions.

## VI. CONCLUSION

The present appeal is not moot. However, the Bank's various arguments fail. Individu-

---

**15.** In support of its contention that the $98,000 should have been credited toward its unsecured claim, the Bank cites various cases that deal with the treatment of rent payments made to an undersecured creditor. These decisions are not applicable here because Debtors' residential property does not generate rent or other income upon which the Bank has a claim. Residential mortgage payments are payments on the Bank's lien. They are not rent or other cash collateral.

298

al debtors filing bankruptcy prior to October 22, 1994, could modify their home mortgages in Chapter 11. The bankruptcy court need not have found that Debtors' residential property is necessary for their effective reorganization prior to confirming their Chapter 11 plan. The bankruptcy court also correctly applied the Bank's § 1111(b)(2) election. Finally, the bankruptcy court properly credited Debtors' prepetition, preconfirmation payments to reduce the secured portion of the Bank's claim. We thus **AFFIRM** the bankruptcy court and **DENY** Debtors' request for sanctions.