In re **DELTA TRANSITIONAL HOME,** Debtor–In–Possession.

No. 2:07–BK–15384M.

United States Bankruptcy Court, E.D. Arkansas, Helena Division.

Jan. 26, 2009.

M. Randy Rice, Rice & Associates, Little Rock, AR, for Delta Transitional Home.

### ORDER

JAMES G. MIXON, Bankruptcy Judge.

On September 28, 2007, Delta Transitional Home (Debtor), a non-profit corporation, filed a voluntary petition for relief under the provisions of Chapter 11 of the United States Bankruptcy Code. The Debtor filed a proposed plan of reorganization to which Southern Financial Partners (Bank) objected. After a confirmation hearing held on September 26, 2008, at Little Rock, Arkansas, the matter was taken under advisement. The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and the Court has jurisdiction to enter a final judgment in the case.

The Debtor is a non-profit corporation which operates a home in Marianna, Arkansas, that provides "emergency shelter and residential placement for female adolescents in foster care between the ages of seven and seventeen." (Tr. at 54.) The residential property was purchased in September 1999 for the sum of $210,000.00. (Tr. at 64.) The operation is financed by the State of Arkansas, Department of Health and Human Services, and by occasional grants. (Tr. at 69.) The Debtor made no down payment when the property was purchased, and the purchase price also included inventory, equipment, and furniture. The money to purchase the property was derived solely from a loan from Arkansas Enterprise Group.[1] (Bank's Ex. 1.)

The Debtor executed a promissory note in favor of Arkansas Enterprise Group on September 15, 1999, in the sum of $213,700.00. (Bank's Ex. 1.) The note was to be repaid in 180 monthly installments of $2,231.31, including interest on the unpaid principal balance accruing at the rate of 9.5% per annum. (Bank's Ex. 1.) The note was secured by a properly perfected first mortgage lien on the real estate and a properly perfected security interest in the equipment, fixtures, and accessions owned by the Debtor. (Bank's Ex. 1.) The Bank introduced Bank's Exhibit 2 which reflected a payoff amount for the note as of September 24, 2008, of $187,695.53 which includes principal, accrued interest, and late charges. The Bank filed a proof of claim for $191,920.06 as of October 10, 2007. (Bank's Ex. 3.)

The plan consists of six classes of creditors including the interest claim of the Debtor. (Debtor's Ex. 1.) All classes have voted to accept the plan, including impaired classes, with the exception of the class containing the Bank's claim. The Bank not only objects to the plan, but has made the 1111(b) election to have its claim treated as fully secured, thereby waiving its right to assert any unsecured claim. (Bank's Ex. 4.) Notwithstanding the provisions of 11 U.S.C. § 1129(a)(8) that requires the acceptance of the plan by all impaired classes, a plan may still be confirmed under the cramdown provisions contained in 11 U.S.C. § 1129(b) over the objection of a class of creditors if certain conditions are met. *In re Danny Thomas Properties III Ltd. Partnership*, 231 B.R.

---

**1.** Southern Financial Partners, the entity which filed the objection to confirmation, was formerly known as Arkansas Enterprise Group.(Bank's Ex. 4.)

298, 301 (Bankr.E.D.Ark.1999), *aff'd,* 241 F.3d 959 (8th Cir.2001).

The plan values the collateral of the Bank, including personal and real property, at $103,175.00. It proposes to pay the secured claim ($103,175.00) in installments of $1,600.00 per month beginning September 15, 2008, including interest accruing at the rate of 9.5% per annum on the unpaid principal balance for 112 months and a final payment of $566.00 on the 113th month. The plan states that in no event will it pay less than the full amount of the Bank's claim of $191,920.00. (Debtor's Ex. 1.) The plan acknowledges that adequate protection payments of $12,234.00 have been made to the Bank during the time the case had been pending, as of the date of the confirmation hearing on September 26, 2008. (Debtor's Ex. 1.)

## I. DISCUSSION

The primary disputed issue in the case concerns the value of the Bank's collateral and the effect of the Bank's decision to make the 1111(b) election. In a Chapter 11 case, a claim is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property. 11 U.S.C. § 506(a); 4 Collier on Bankruptcy ¶ 506.02 (15th ed. rev.2008). If the creditor's claim is greater than the value of the property securing it, then the creditor has an unsecured claim for the difference. 11 U.S.C. §§ 506(a), 1111(b)(1)(A). However, the Bank in this case elected to be treated as a fully secured creditor under the provisions of 11 U.S.C. § 1111(b)(2). Section 1111(b)(2) provides that an allowed claim is a secured claim to the full extent the claim is allowed rather than to the extent of the value of the collateral as provided in 11 U.S.C. § 506(a). *See also*

1129(b)(2)(A)(i)(II). Section 1129(a)(7)(B) also provides that if the 1111(b) election is made:

> [e]ach holder of a claim … will receive … property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

■ Therefore, pursuant to 1111(b), the plan must pay this creditor the full amount of its allowable claim if paid over time or the plan payments must equal at least the present value of the creditor's secured portion of its claim (value of its collateral) as of the effective date of the plan, whichever is the greater number.[2] *Wade v. Bradford,* 39 F.3d 1126, 1129 (10th Cir.1994); *John Hancock v. Route 37 Bus. Park Assocs.,* 987 F.2d 154, 156 n. 4 (3d Cir.1993); *First Federal Bank of California v. Weinstein (In re Weinstein),* 227 B.R. 284, 294 (9th Cir. BAP 1998); 7 Collier on Bankruptcy ¶ 1111.03[4] (15th ed. rev.2008). The value of the Bank's collateral must first be decided in order to determine how the 1111(b) election affects the amount the Debtor must pay the Bank under the plan.

## II. THE EVIDENCE

### A. John French

John French (French), senior lender with Southern Financial Partners, testified on behalf of the Bank. (Tr. at 10.) He testified that the Bank filed a claim in the case for $191,920.06 (Tr. at 10 & Bank's Ex. 3.) The claim was filed on October 10, 2007. (Bank's Ex. 3.) French stated that all adequate protection payments received during the time the case has been pending have been applied to principal, interest, and attorney's fees and costs. (Tr. at 15.)

---

**2.** "Present value includes 'the time value of money.'" *First Federal Bank of California v. Weinstein (In Re Weinstein),* 227 B.R. 284, 294 n. 11 (9th Cir. BAP 1998)(quoting *In re S.E.T. Income Properties, III,* 83 B.R. 791, 793 (Bankr.N.D.Okla.1988)).

French testified that the appropriate interest rate to be applied in order to arrive at the present value of the Bank's allowed secured claim if the claim is paid over 113 months is 8% per annum, which he computed by adding three points to the prime rate of 5% (Tr. at 24.) The Debtor does not dispute this testimony even though the proposed plan provides for a higher rate. (Debtor's Ex. 1.)

French also testified that the note held by the Bank is guaranteed by the USDA Rural Development. (Tr. at 73.) However, before the Bank may collect on the guaranty it is required to foreclose on the collateral and exhaust all other avenues of collection. (Tr. at 73.) French testified that he reviewed his loan file before the hearing but did not bring the entire file with him. (Tr. at 76.) He testified that the Bank had the property appraised by Dwight Brown (Brown) since the bankruptcy was filed. (Tr. at 77.) The Bank did not introduce Brown's appraisal and did not bring a copy of his appraisal to the hearing. French said he could not remember the amount of the appraisal. (Tr. at 77–80.) The Bank also had an appraisal performed by Jack Horner (Horner) which was introduced and which was substantially higher than Brown's. (Tr. at 80.) French stated that he did not agree with the method of valuation used by Brown. (Tr. at 77–78.)

French denied that he specifically requested Horner to use a cost-approach analysis. (Tr. at 81.) When confronted with printed provisions of the Horner appraisal stating "[t]his is a limited appraisal since I am relying only on the cost approach in estimating a value per client request," French stated that "the conversation that I had with him was, to use the valuation method that made the most sense. I do agree with him that the cost approach is the most appropriate because

of the complete lack of comparable sales." (Tr. at 82.)

When asked directly whether he thought a buyer in Marianna, Arkansas, would pay $283,000.00 for the real estate (the amount of Horner's appraisal), French admitted, "[I]t might sell for something lower than the appraised value." (Tr. at 82–83.) French agreed that Marianna is in an impoverished area. (Tr. at 84.)

## B. Jack Horner

The Bank called Horner of Helena, Arkansas, as an expert appraisal witness. Horner testified that he made an appraisal of the Debtor's real property on June 17, 2008. (Tr. at 27.) He described the property as a two-story building with approximately 6,004 square feet, consisting of a living room, dining room, three offices, ten bedrooms, and eight and one-half bathrooms. (Tr. at 28.) He testified that he used the cost approach-less depreciation method of appraisal. (Tr. at 28.) He stated he used this approach and not the market or comparable sales approach because he could find no comparable sales of transitional homes in the immediate area. (Tr. at 28.) He considered the property to be unique in that it was previously a bed and breakfast inn. (Tr. at 28 & 57.) Based on the cost-less depreciation approach, he valued the property at $283,000.00 for the real estate and dwelling. (Tr. at 29.) He said he was instructed to use the cost approach if there were no comparable sales. (Tr. at 33.) When asked directly whether his opinion reflects what the property would bring if exposed to the market and given sufficient time to sell, Horner deflected the question by replying, "[a]ctually that's kind of difficult to answer really. I—in all honestly, probably it would have to be on the market for a while." (Tr. at 41.)

### C. Robbia Johnson

The Bank called Robbia Johnson (Johnson), the Executive Director of the Debtor. (Tr. at 42.) She identified the Debtor's September 8, 2008, operating report, which reflected a value of the Debtor's furniture and equipment at $31,353.00. (Tr. at 45.) She stated the values in the operating report of the personal property were book values taken from prior audit reports and, as a practical matter, the furniture has very little value. She estimated that "you might get one thousand dollars" for the property. (Tr. at 55–56.) She said that the children who are residents are hard on the furniture and sometimes intentionally destroy the furniture. (Tr. at 56–57.)

Johnson stated the property is in disrepair. (Tr. at 59.) She testified flooring on the porch and in the dining room and a bathroom is in need of replacement, the exterior and interior of the home requires repainting, the central heating unit is inoperable, the security fence is broken, the driveway needs repair, the rooms require additional furniture, and the roof leaks despite being replaced last year. (Tr. at 51.) Johnson estimated the value of the real estate at $70,000.00 to $75,000.00. (Tr. at 60.) Johnson agreed that the Marianna area is poor, has one of the lowest per capita incomes in the state, and has been losing population for a number of years. (Tr. at 68.)

### D. David Jacobs

The Debtor offered the testimony of David Jacobs (Jacobs) of Stuttgart, Arkansas, as an expert appraisal witness. He stated he appraised the Marianna property in April 2008. (Tr. at 87.) He estimated the market value of the real property at $93,700.00. (Tr. at 87–88.) He inspected the property and found it to be in fair condition. (Tr. at 88.) He estimated that repairs for the property (painting the exterior, replacing rotten wood and the front porch, heating unit replacement, and other necessary repairs) would cost $22,500.00. (Debtor's Ex.3.) He estimated the age of the dwelling at 116 years. (Debtor's Ex.3.)

Jacobs based his estimate on comparable sales he found in the immediate area and in Helena, Arkansas, which he adjusted for differences in location, size, and age from the subject property. (Tr. at 89.) Jacobs calculated the heated square footage of the subject property to be 5,862 square feet. (Tr. at 90.)

### III. ANALYSIS

The estimate by Horner, the Bank's appraiser, of the value of the Debtor's residence seems an unlikely estimate of the market value of the Debtor's property. Of course, a home this size built 116 years ago would cost substantially more to construct using today's prices, and even after reducing the cost to construct such a home by standardized depreciation, the resulting calculation would not appear to yield a valid estimate of the price a willing buyer would pay a willing seller. Horner admitted this in his testimony when he stated that his estimate was not market value but cost-less depreciation using today's values. (Tr. at 37.)

The accuracy of Horner's appraisal is diminished considerably because Horner was instructed by the Bank to use a particular appraisal method. The Court draws a negative inference from the testimony of French that the Bank had another appraisal of the property that was lower than Horner's and the Bank declined to present it in evidence. French's testimony that he did not remember the estimated value of the unused appraisal is simply not credible. Therefore, the Court gives very little weight to the estimated value by the Bank or its appraiser, Horner.

Johnson's estimate of value of the residence is also awarded little weight. She had no basis for the value; she simply based her value on the Jacob's appraisal.

Mr. Jacob's appraisal, on the other hand, is based on comparable sales adjusted for time, size, and distance and it is the only evidence in the record supported by market data. Therefore, the value of the real estate is found to be $93,700.00, which is the amount of Jacob's appraisal.

The only evidence of the value of the personal property offered by the Bank was the book value reflected on operating reports in the sum of $31,358.00. No other evidence of the value of the personal property was offered except Johnson's estimate of $1,000.00. The plan allows $9,675.00 as a value of the personal property, and absent any persuasive evidence to the contrary, that amount is accepted as the appropriate number. Therefore, the secured portion of the Bank's claim is found to be $103,375.00 as of the date of the confirmation hearing. Based on the Bank's witness's testimony, the appropriate discount rate to be applied to arrive at the present value of the secured portion of the Bank's claim is 8%.

The plan term is for 113 months from the effective date. The plan provides that adequate protection payments have already been made to the Bank in the sum of $12,234.00. No evidence was offered by the Bank of any depreciation of its collateral between the date the petition was filed and the confirmation hearing date. Therefore, all adequate protection payments must be applied to the secured portion of Bank's claim of $103,375.00. See *First Federal Bank of California v. Weinstein (In re Weinstein),* 227 B.R. 284, 296 (9th Cir. BAP 1998); 3 Collier on Bankruptcy ¶ 361.03[2][a] (15th ed. rev.2008).

■ The value of the Bank's unpaid secured claim of $103,375.00, using a dis-

count rate of 8% paid over a period of 113 months, is $1,305.17 per month and computes to a total of $147,484.21. The correct amount of the full amount of the bank's allowed claim is not shown by the record. The claim filed was $191,920.06 as of October 10, 2007. French testified that adequate protection payments were applied to principal, interest, and attorney's fees. The claim itself adds $2,704.19 in foreclosure fees and costs and $3,500.00 estimated attorney's fees. In view of the Court's ruling that the Bank is undersecured, it does not possess an allowable secured claim for attorney's fees, costs or post-petition interest. 11 U.S.C. § 506(b); 4 Collier on Bankr., ¶ 506.04[i] (15th ed. rev.2008).

Therefore, the plan must be amended to reflect the proper amount of the Bank's allowed secured claim without attorney's fees and costs and crediting adequate protection payments to the principal debt. If the amount of the allowable claim is greater than the present value of the secured portion of the claim paid over 113 months ($147,484.21), then the plan must pay the full amount of the proper secured claim over the 113 month-life of the plan without interest.

## IV.  OTHER ARGUMENTS

The Bank makes other arguments in opposing confirmation.

### A.  Bad Faith

■ The Bank argues that the plan is proposed in bad faith because the Debtor's income is sufficient to pay the full monthly payments of the Bank's prepetition claim. Section 1129(a)(3) requires that the plan must be proposed in good faith and not by any means forbidden by law. The Bank cites no cases and research has failed to find cases holding that a plan which pays

a creditor holding a fully secured claim under 11 U.S.C. § 1111(b) the amount required by the Bankruptcy Code is somehow *per se* filed in bad faith. The argument flies in the face of the evidence. The Debtor's income fluctuates according to the number of homeless girls who are housed in the facility. The operators of the Debtor have gone months without salary because of a lack of funds. The facility is in need of repairs as testified to by Ms. Johnson and made apparent from the pictures attached to the appraisal. The Bank's argument is simply without merit.

### B. Unfair Discrimination

The Bank argues that the plan unfairly discriminates against the Bank. Section 1129(b)(1) provides that a plan may be confirmed only if "the plan does not discriminate unfairly ... with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

The plan places the Bank's secured claim in Class 3 and the secured claim of Honda in Class 2. (Debtor's Ex. 1.) Honda is a fully secured creditor holding a claim of $4,586.53, according to the plan. (Debtor's Ex. 3.) The Debtor values the creditor's collateral, a 2003 Honda Pilot vehicle, at $4,000.00 in the schedules and scheduled the claim of Honda at $4,000.00. The plan proposes to pay the claim in full at the rate of $697.52, which is the amount provided for by the prepetition note. (Debtor's Ex. 3.)

■ The Bank argues that it is unfair discrimination to pay Honda's secured claim in full and not pay the Bank's secured claim in full. As stated in 7 Collier on Bankruptcy ¶ 1129.04[3][a] (15th ed. rev.2008), "[t]he test [for unfair discrimination] thus boils down to whether the proposed discrimination has a reasonable basis and is necessary for reorganization." See *In re 203 North LaSalle Street Ltd. P'ship,* 190 B.R. 567, 585–86 (Bankr.

N.D.Ill.1995), *aff'd,* 126 F.3d 955 (7th Cir. 1997).

■ There are many meaningful distinctions between Honda's claim and the Bank's claim in this case. The Bank's claim is a long-term claim and dwarfs the amount of Honda's short term claim. The Bank has elected the fully secured treatment provided by 11 U.S.C. § 1111(b) and Honda has not. The treatment of the Bank's claim is necessary for reorganization while there is no evidence that Honda's claim is. No plan could be proposed that would pay Honda's secured claim and the Bank's secured claim in the same amount over the same period. The claims are fundamentally different. Honda's collateral is a vehicle that depreciates rapidly while the Bank's claim is secured primarily by real estate which is not subject to rapid depreciation. The Bank's argument is without merit because the different treatment of the two classes of claims is not only rational, but is required by the facts in the case and the different nature of the claims.

## V. CONCLUSION

Because of the passage of time since the plan was proposed, the confirmation hearing was held, the date of this opinion, and the payment of adequate protection payments, the amount of plan payments due the Bank will have changed.

Therefore, the Debtor is granted twenty (20) days to file a modified plan calculating the Bank's claim and the monthly payments to be made over the 113–month life of the plan as stated herein. Notice of opportunity to object to the modified plan shall be given as provided by the Federal Rules of Bankruptcy Procedure.

IT IS SO ORDERED.