FILED

NOT FOR PUBLICATION

NOV 08 2011

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | ) BAP No.  OR-10-1523-JuClPa |
| THE MARSHALL GROUP, LLC, | ) Bk. No.  08-34585 |
| Debtor. | ) |
| MARK R. MARSHALL; CATHY JO MARSHALL, | ) |
| Appellants, | ) |
| v. | ) M E M O R A N D U M* |
| THE MARSHALL GROUP, LLC; CONRAD MYERS, Trustee; UNITED STATES TRUSTEE, | ) |
| Appellees. | ) |

Argued and Submitted on October 20, 2011
at Portland, Oregon

Filed - November 8, 2011

Appeal from the United States Bankruptcy Court
for the District of Oregon

Honorable Randall L. Dunn, Bankruptcy Judge, Presiding
_____

Appearances:    Appellant Mark R. Marshall argued for himself
and Cathy Jo Marshall pro se;
Peter C. McKittrick, Esq., of Farleigh, Wada &
Witt argued for Appellee Conrad Myers, Trustee.
_____

---

* This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

-1-

Before: JURY, CLARKSON,[**] and PAPPAS Bankruptcy Judges.

At issue in this appeal is the revocation of a confirmation order. The order confirming the second amended plan of reorganization dated June 21, 2010 (as modified September 7, 2010) (the "Plan") filed by appellee, Conrad Myers, the chapter 11[1] trustee, was entered on September 30, 2010. Appellants, Mark R. Marshall and Cathy Jo Marshall (the "Marshalls"), did not appeal that order or move to stay implementation of the Plan. They subsequently moved for revocation of the order confirming the Plan under § 1144, which the bankruptcy court denied. The Marshalls now appeal that decision.

The effective date of the Plan was October 15, 2010 (the "Effective Date"). Since then, numerous transactions have been completed or implemented according to the Plan and distributions have commenced. As a result, we conclude that the Plan has been substantially consummated within the meaning of § 1101(2). We further conclude that we cannot fashion effective relief for the Marshalls on appeal and, even if we could, it would be inequitable to do so under these circumstances. Accordingly, we DISMISS this appeal as moot.

---

[**] Hon. Scott C. Clarkson, Bankruptcy Judge for the Central District of California, sitting by designation.

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. "Rule" references are to the Federal Rules of Bankruptcy Procedure and "Civil Rule" references are to the Federal Rules of Civil Procedure.

-2-

Alternatively, even if this appeal were not moot, we would AFFIRM the bankruptcy court's decision.

## I.  FACTS

The facts leading up to the bankruptcy of The Marshall Group, LLC are not fully developed in the record, but are lengthy and complex.  The Marshalls were the sole members of the Marshall Group, LLC.  The Marshall Group, LLC was the surviving entity under a roll up consolidation agreement entered into on July 31, 2008, in contemplation of the filing of bankruptcy. The parties to that agreement were:  (1) The Marshall Group, LLC; (2) Marshall Medical, LLC; (3) Lincoln City Immediate Health Care, LLC; (3) Redmond Immediate Health Care, LLC; (4) McMinnville Immediate Health Care, LLC; (5) Marshall McMinnville, LLC; and (6) M&CJ, LLC.

Through some of these entities, the Marshalls owned and developed commercial property, including several parcels which were located in the business district of McMinnville, Oregon (the "McMinnville Property").  At some point, the Marshalls hired Keeton-King Construction, Inc. ("KKC") to perform demolition and construction work on their various properties. The record shows that the Marshalls also entered into several transactions with Arland and Ima Jean Keeton (the "Keetons") which we describe below.

The Marshalls were also engaged in the health care business through their health care-named limited liability companies.

//

//

//

-3-

They operated urgent care clinics in Lincoln City,[2] McMinnville and Redmond, Oregon. The Marshalls apparently became involved in the health care business after they obtained a $5 million business and industry conditional commitment from the United States Department of Agriculture to build two medical buildings in 2002. Under the terms of the commitment, one of the buildings had to be located in a rural area. Because the Marshalls' McMinnville Property did not meet that requirement, with the assistance of KKC, the Marshalls located property in Redmond, Oregon. In addition, construction of the buildings had to be completed within 540 days. Otherwise, the Marshalls would lose the loan guarantee which was a critical part of the project plan.

KKC was involved with the construction of the health care buildings on the McMinnville and Redmond properties. Numerous disputes arose between the Marshalls and KKC in connection with the development of the McMinnville Property. In late 2007, KKC filed a $1.7 million construction lien claim against the McMinnville Property. Thereafter, KKC commenced an arbitration proceeding regarding construction related claims between the parties with respect to the lien. KKC made claims for unpaid work while the Marshalls alleged that the project took substantially longer than expected and far exceeded the contractually agreed upon construction costs. Presumably because of the extra costs and delays, the McMinnville Property

---

[2] The Lincoln City clinic was closed prior to debtor's bankruptcy filing.

-4-

was at risk. The Marshalls' opening brief suggests foreclosure of the McMinnville Property by the Keetons was imminent.[3]

In addition to the arbitration proceeding, the Keetons and KKC as plaintiffs, and the Marshalls, Marshall McMinnville, LLC, M&CJ, LLC, Endeavors Inc., Marshall Properties, LLC, The Marshall Group, LLC, and Lake Plaza, LLC, as defendants, were parties in a Yamhill County Circuit Court proceeding. The parties' dispute in the circuit court proceeding involved, among other things, breach of contract and foreclosure of trust deeds.[4]

## Bankruptcy Events

On September 4, 2008, The Marshall Group, LLC (which included Marshall McMinnville, LLC, M&CJ, LLC, McMinnville Immediate Health Care, LLC and Redmond Immediate Health Care, LLC) filed a chapter 11 petition. Schedule A showed that debtor owned real property valued at $8,970,000 which consisted of commercial office buildings in McMinnville. On Schedule D, debtor listed secured debt of $7,405,419, of which $6,399,162 was unsecured. Debtor listed $490,528 in priority debt on Schedule E representing unpaid employment taxes. On Schedule F,

---

[3] The Marshalls state in their opening brief that they were in default with PremierWest Bank which had a consensual lien on the McMinnville Property. They then allege that the bank sold its interests in the loans collateralized by the McMinnville Property to the Keetons and then that the Keetons formed a new company, AJK, LLC to harbor that loan. There is no evidence in the record that supports these facts.

[4] We take judicial notice of the Keetons' motion for relief from stay at Dkt. No. 105 which contains this information. See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

debtor listed $4,738,683 in unsecured debt.[5]  At the time of debtor's filing, it was operating the two urgent care clinics located in McMinnville and Redmond.  The clinics were suffering from issues with accounts receivable and cash flow.  In addition, debtor was still involved in the arbitration proceeding with KKC over the construction costs associated with the McMinnville Property and the state court case was pending.

On September 23, 2008, the United States Trustee ("UST") appointed a committee of unsecured creditors (the "Committee").

**A.    The KKC Adversary Proceeding**

On January 13, 2009, the Keetons, KKC and AJK Properties, LLC[6] (hereinafter we refer to these parties as "Keeton-King") filed an adversary proceeding against the Marshalls individually, debtor and other Marshall related entities.  The complaint, which was over sixty pages long, alleged several claims for relief, including breach of contract, foreclosure of trust deeds, and foreclosure of assignment of rents.[7]

The background facts alleged in the complaint show that the Marshalls had personally executed two promissory notes in favor of Keeton-King for $980,000 and that Keeton-King was owed for construction work performed on numerous properties,

---

[5] A significant number of the unsecured creditors were patients who were owed refunds in small amounts.

[6] AJK Properties, LLC was evidently owned by the Keetons.

[7] We take judicial notice of the adversary complaint because it is relevant to this appeal.  In re Atwood, 293 B.R. at 233 n.9.  It is unclear whether the Keeton-King adversary complaint was identical to the complaint that was filed prepetition in the Yamill County Circuit Court.

-6-

including on the McMinnville project (collectively, these debts are referred to in the complaint as the "Global Debt"). Further, Keeton-King had loaned another Marshall related entity, M&CJ, LLC, $1 million dollars (the "Million Dollar Loan"). When none of these debts were paid, the Keeton-King parties and the Marshalls and their related entities entered into an agreement in April 2007.[8] That agreement extended the due date for the Global Debt and the Million Dollar Loan to 120 days after the completion of the McMinnville project. In return, the Marshalls and their LLCs agreed to be jointly and severally liable to the Keeton-King parties. Finally, the complaint states that after the April 2007 agreement, the Keetons loaned the Marshalls and their LLCs additional sums which included making their interest payments to PremierWest Bank for the $3.2 million loan obtained by debtor that had been increased to $3.725 million.

All together, Keeton-King asserted claims which were secured by debtor's real property in excess of $5 million and claimed to hold unsecured debts in the amount of $6 million. Debtor and its co-defendants asserted counterclaims seeking $1 million and attorney's fees.

//

---

[8] In the Marshalls' opening brief, they maintain that they were "forced" into this new agreement which was written by the Keeton's CPA, Michael W. Holland, who actually had his license revoked at the time. The Marshalls state that Holland is now a convicted felon and has been reprimanded by the Oregon State Bar for generating the April 2 "agreement" and practicing law without a license. There is no evidence in the record that supports these statements. In any event, whether or not these alleged facts are true does not matter for purposes of this appeal.

**B.   The Arbitration Proceeding Concludes**

On February 24, 2009, the bankruptcy court granted KKC relief from stay to continue with the arbitration proceedings.

In September 2009, KKC obtained an arbitration award against the Marshalls for $2.7 million plus interest and attorney's fees.  The final award was entered on October 6, 2009.  The Marshalls moved to vacate the award, arguing that KKC procured the award by fraud, corruption, or other undue means.  The factual basis for the Marshalls' allegation was that KKC had assisted them in locating the property upon which to build their Redmond clinic.  According to the Marshalls, it came to light that the Keetons were co-owners of other properties in the Redmond development where the clinic was eventually located.  The Marshalls maintained that KKC had performed the construction work on the Redmond property first for the benefit of the Keetons and used construction loan proceeds from the Marshalls to make capital improvements to their properties.

The state court directed the arbitrators to reopen the case and hear the Marshalls' fraud arguments.  After doing so, the arbitrators dismissed the Marshalls' motion to vacate and the state court entered a final order confirming the arbitration award in June 2010.

**C.   The Appointment Of The Trustee**

On March 27, 2009, the UST filed a motion to dismiss or convert the bankruptcy case to one under chapter 7.  The motion was mostly based on debtor's failure to pay taxes, including employment tax obligations, and alleged unauthorized payments going from debtor to Mr. Marshall and vice versa.  Prior to the

hearing on that motion, the UST filed a motion to appoint a chapter 11 trustee in the event the court found dismissal or conversion inappropriate.

Numerous parties, including debtor's attorney, appeared at the April 28, 2009 preliminary hearing on the UST's two motions. After the preliminary hearing, and before the final hearing, the parties stipulated that (1) the UST's motion to dismiss would be denied, (2) the motion to convert was reserved pending the chapter 11 trustee's report, and (3) the UST's alternative motion to appoint a chapter 11 trustee was granted. The stipulation further provided that the chapter 11 trustee would promptly investigate the financial circumstances of debtor and file an initial report not later than four weeks after the date of acceptance of appointment. The court approved the stipulation and on May 8, 2009, Conrad Myers was appointed the trustee.

The trustee took several months to investigate the operations and cash flow from the urgent care clinics. In a July 31, 2009 report, the trustee concluded that the clinics could be turned around and eventually sold for the benefit of the creditors.[9] In addition, the trustee elected not to commit the limited cash flow of the estate to engage in costly litigation with KKC. Accordingly, the trustee engaged in negotiations with the Keeton-King parties to settle their secured and unsecured claims asserted in the adversary

---

[9] We take judicial notice of the trustee's report which is at Dkt. No. 209. In re Atwood, 293 B.R. at 233 n.9.

-9-

proceeding.

In March 2010, the trustee filed a notice of intent to compromise the Keeton-King claims. At the same time, the trustee filed a notice of intent to sell the McMinnville Property to Keeton-King by credit bid, free and clear of liens. The trustee also filed a motion for an order authorizing debtor to enter into a lease agreement with Keeton-King so that it could continue to operate the McMinnville urgent care clinic on the property. Finally, the trustee filed a motion for a determination that the Keeton-King parties were good faith purchasers within the meaning of § 363(m).

The basic structure of the proposed settlement was as follows: Keeton-King would be allowed a $4.5 million secured claim; the trustee would convey the McMinnville Property to Keeton-King free and clear of all liens; the trustee and Keeton-King would enter into a lease agreement for the McMinnville Property with Keeton-King as landlord and debtor as tenant; Keeton-King would be allowed an unsecured claim in an amount determined by the parties or the court; and the estate and Keeton-King would enter into a settlement agreement and mutual release.

The Marshalls filed an objection to the trustee's proposed sale and compromise, asserting that (1) there was a substantial basis for overturning the arbitration award; (2) the settlement improperly resolved the claims without adequate information; (3) the settlement included property that was not part of the estate; and (4) the value of the McMinnville Property exceeded the amount of any asserted claims by the Keeton-King parties.

-10-

Although they filed this objection, the Marshalls did not appear at the June 14, 2010 hearing, produce any witnesses or offer any evidence in support of their alleged value of the McMinnville Property.

The bankruptcy court approved the compromise, the lease arrangement, and the sale free and clear of liens and made a good faith determination by separate orders entered on June 28, 2010. Those orders were not appealed and became final orders in the case.

**D.    The Confirmation Of The Chapter 11 Trustee's Plan**

A week before entry of these orders, on June 21, 2010, the trustee filed the Second Amended Disclosure Statement and Plan of Reorganization. Generally, the Plan provided for the continued operation of the urgent care clinics so that they could eventually be sold for the benefit of the creditors. Through the Plan, the chapter 11 trustee was appointed as the Liquidating Trustee and was given the flexibility to exercise reasonable business judgment to determine when to sell the clinics.

Under the Plan, the Marshalls comprised the interest holders class (Class 7) - each held a 50% membership interest in debtor. They received no payment for their membership interests and, therefore, they were impaired under § 1124 and deemed to reject the plan under § 1126(g). Consequently, the Marshalls were not entitled to vote on the Plan.

Objections to the Plan were due on August 31, 2010. The Marshalls did not file an objection to the Plan or appear at the confirmation hearing. No testimony was taken during the

-11-

confirmation hearing and the bankruptcy court placed its findings and conclusions on the record, deciding that all the statutory requirements for confirmation of the Plan were met. On September 30, 2010, the court entered the order confirming the Plan. The Marshalls did not appeal the confirmation order or request a stay of implementation of the Plan.

On the Effective Date of the Plan (October 15, 2010), debtor became the reorganized debtor and the Marshalls' membership interests were canceled and reissued to the Marshall Group, LLC Liquidating Trust (the "Liquidating Trust"). The membership interests are currently held for the benefit of priority and unsecured creditors. Meanwhile, the clinics have been operating and payments have been made to administrative and priority claimants. In addition, the Plan vested certain secured and unsecured creditors (or creditor representatives) with the right to be on an advisory committee (the "Advisory Committee"). The Advisory Committee's role was to act in the capacity of a board of directors and oversee the Liquidating Trustee and manager of the day-to-day operations, Performance Improvement Resources. At the time of this appeal, the creditors, Liquidating Trustee, and Advisory Committee have been following the provisions of the Plan for over a year.

**E. The Marshalls' Motion To Deny And Revoke The Confirmation Order**

On October 15, 2010, the Marshalls filed their motion to deny and revoke the confirmation order confirming the trustee's Plan. In their motion, the Marshalls requested entry of an order that provided for (1) the immediate stay of the Plan

-12-

confirmation; (2) a hearing as provided under § 1144; and (3) restoration of the Marshalls' debtor-in-possession status or an immediate appointment of a new trustee.

The Marshalls alleged that the proper procedures were not used for their removal as debtors-in-possession;[10] that the trustee had not carried out his fiduciary responsibilities and had grossly mismanaged the businesses; and that the Plan had not been offered in good faith. Finally, the Marshalls alleged that the arbitration award was obtained by fraud and that there was an ongoing RICO criminal investigation concerning the actions of KKC and the Keetons during the arbitration proceedings.

The trustee filed an opposition, asserting that the Marshalls had to show that the trustee procured the confirmation order by actual fraud to succeed on their motion under § 1144. The trustee argued that the court should be "very cautious" in revoking the Plan when the Marshalls did not have a right to vote and none of the voting creditors who were allegedly defrauded joined or supported their motion.

At the December 1, 2010 hearing on the Marshalls' attorney's motion to withdraw, the court conducted a "preliminary hearing" on the Marshalls' motion to deny or revoke the Plan. The bankruptcy court clarified the issues and the corresponding evidence that was to be presented at the final evidentiary hearing scheduled for December 14, 2010. First, the bankruptcy court made clear that the arbitration award was a

---

[10] The Marshalls refer to themselves as debtors-in-possession, however, the Marshalls were not in bankruptcy themselves.

-13-

final judgment and any issues related to that award would not be considered. Mr. Marshall acknowledged to the court that the arbitration award was final and that they would not have another opportunity to present evidence to the bankruptcy court so that it could be overturned.

In addition, the bankruptcy court stated that it was treating the Marshalls' motion to revoke the plan as a motion under Civil Rule 60(b) because there was no testimony at the confirmation hearing.[11] The court further explained that the Marshalls had to show that the court was wrong in confirming the Plan under § 1129(a).

At the December 14, 2010 final evidentiary hearing,[12] the court reiterated that it would not take evidence regarding the Keeton-King transactions, whether related to the settlement of

---

[11] It is unclear what subsection of Civil Rule 60(b) the court was referring to.

[12] Three days after the Marshalls filed their motion seeking revocation of the confirmation order, the trustee filed a motion to settle and compromise Keeton-King's unsecured claims which was also scheduled for hearing on December 14, 2010. The Marshalls objected to the trustee's proposed settlement. The bankruptcy court overruled the Marshalls' objection to the settlement at the December 14, 2010 hearing. The court advised the Marshalls that if they ever had specific documentation after the criminal proceedings were finished, they could move for reconsideration of the order at that time.

In their opening brief, the Marshalls state that an issue on appeal is whether the bankruptcy court erred in denying their objection to the trustee's motion to compromise Keeton-King's unsecured claims. However, they did not designate this order in their notice of appeal and that order has become a final order in the case. Evidently, in an abundance of caution (or oversight), the trustee's brief addresses the merits of this order. It is unnecessary for us to consider these arguments.

-14-

the adversary proceeding or in relation to the arbitration proceeding. The court then focused on whether the confirmation order was procured by fraud under § 1144.[13] Mr. Marshall was sworn in and testified, but the record reflects that his testimony was about the alleged fraud of Keeton-King. The court denied the Marshalls' motion by order entered December 15, 2010. The Marshalls timely appealed.

## II. JURISDICTION

The bankruptcy court had jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (L). As set forth below, we conclude that this appeal is moot. Therefore, we do not have jurisdiction over the moot appeal. I.R.S. v. Pattullo (In re Pattullo), 271 F.3d 898, 900 (9th Cir. 2001). If this appeal were not moot, we have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

A. Whether this appeal is moot; and

B. Whether the bankruptcy court erred by denying the

---

[13] This focus was inconsistent with the bankruptcy court's earlier directive to Mr. Marshall that it was treating the Marshalls' motion for revocation of the confirmation order under Civil Rule 60(b). In that regard, the court stated that Mr. Marshall had to demonstrate how the court's ruling was "wrong" rather than how the confirmation was "procured by fraud" within the meaning of § 1144. However, reliance on Civil Rule 60(b) or § 1129(a) to revoke a confirmation order is contrary to Ninth Circuit law. Dale C. Eckert Corp. v. Orange Tree Assocs., Ltd. (In re Orange Tree Assocs., Ltd.), 961 F.2d 1445, 1447 (9th Cir. 1992). In any event, the court's error was harmless in light of our decision to dismiss this appeal as moot. See Rule 9005 (incorporating Civil Rule 61 which states "At every stage of the proceeding, the court must disregard all errors or defects that do not affect any party's substantial rights.").

-15-

Marshalls' motion for revocation of the order confirming the Plan.

## IV. STANDARD OF REVIEW

Mootness is a question of law reviewed de novo. <u>S. Or. Barter Fair v. Jackson Cnty., Or.</u>, 372 F.3d 1128, 1133 (9th Cir. 2004); <u>Arnold & Baker Farms v. United States (In re Arnold & Baker Farms)</u>, 85 F.3d 1415, 1418 (9th Cir. 1996).

We review the bankruptcy court's decision to deny a motion to revoke an order of confirmation for an abuse of discretion. <u>Vicenty v. San Miguel Sandoval (In re San Miguel Sandoval)</u>, 327 B.R. 493, 511 (1st Cir. BAP 2005); <u>Varde Inv. Partners, L.P. v. Comair, Inc. (In re Delta Air Lines, Inc.)</u>, 386 B.R. 518 (Bankr. S.D.N.Y. 2008). We follow a two-part test to determine objectively whether the bankruptcy court abused its discretion. <u>United States v. Hinkson</u>, 585 F.3d 1247, 1261-62 (9th Cir. 2009). First, we "determine de novo whether the bankruptcy court identified the correct legal rule to apply to the relief requested." <u>Id.</u> Second, we examine the bankruptcy court's factual findings under the clearly erroneous standard. <u>Id.</u> at 1262 n.20. We affirm the court's factual findings unless those findings are "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" <u>Id.</u> (internal quotation marks omitted). If the bankruptcy court did not identify the correct legal rule, or its application of the correct legal standard to the facts was illogical, implausible, or without support in the record, then the bankruptcy court abused its discretion. <u>Id.</u>

-16-

## V. DISCUSSION

### A. Mootness

We consider first whether we have jurisdiction to entertain the Marshalls' appeal. The trustee asserts that this appeal is both constitutionally and equitably moot. As the party advocating mootness, the trustee bears the burden of proving that there is no effective relief for us to provide. Palmdale Hills Prop., LLC v. Lehman Comm. Paper, Inc. (In re Palmdale Hills Prop., LLC), 654 F.3d 868, 2011 WL 3320429, at *4 (9th Cir. 2011).

We have previously described the constitutional and equitable mootness rules in United States v. Gould (In re Gould), 401 B.R. 415, 421 (9th Cir. BAP 2009), aff'd, 603 F.3d 1100 (9th Cir. 2010):

> Constitutional mootness derives from Article III of the United States Constitution, which provides that the exercise of judicial power depends on the existence of a case or controversy. The doctrine of constitutional mootness is essentially a recognition of Article III's prohibition against federal courts' issuing advisory opinions. While the Article III mootness doctrine has a 'flexible character,' it applies when events occur during the pendency of the appeal that make it impossible for the appellate court to grant effective relief. If no effective relief is possible, we must dismiss for lack of jurisdiction.
>
> A variation of the mootness rule, the equitable mootness doctrine, applies when appellants 'have failed and neglected diligently to pursue their available remedies to obtain a stay' and circumstances have changed so as to 'render it inequitable to consider the merits of the appeal.'

These rules, which affect our jurisdiction, apply in a § 1144 proceeding. See In re Delta Air Lines, 386 B.R. at 537 n.15 citing Chang v. Servico, Inc. (In re Servico, Inc.), 161 B.R. 297, 300-01 (S.D. Fla. 1993); Almeroth v. Innovative Clinical

-17-

Solutions, Ltd. (In re Innovative Clinical Solutions, Ltd.), 302 B.R. 136, 141 (Bankr. D. Del. 2003) (applying equitable mootness to dismiss a case brought under § 1144); S.N. Phelps & Co. v. Circle K Corp. (In re Circle K Corp.), 171 B.R. 666, 669-70 (Bankr. D. Ariz. 1994) (dismissing § 1144 complaint on grounds of mootness).

### 1. This Appeal Is Constitutionally Moot

We may dismiss an appeal based on mootness when a reorganization plan has been so substantially consummated that effective relief is no longer available. See Arnold & Baker Farms, 85 F.3d at 1419-20. "'[S]ubstantial consummation means — (A) transfer of all or substantially all of the property proposed by the plan to be transferred has been transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." § 1101(2).

Here, numerous critical transactions have been completed or implemented in accordance with the confirmed Plan:

• Prior to confirmation, the McMinnville Property was sold to Keeton-King in satisfaction of its secured claims pursuant to a court-approved compromise. The order approving that sale was entered by a separate order which long ago became a final order in this case. Part and parcel of that sale was Keeton-King's agreement to lease the McMinnville Property to debtor so that it could continue to operate the McMinnville urgent care clinic on the property. That order also is final and cannot be undone. The sale and lease are critical to the

-18-

continued operation of the McMinnville urgent care clinic which itself is a crucial component of the Plan.

• On the Effective Date, the Marshalls' equity interests in debtor were extinguished and new membership interests were issued in the name of the Liquidating Trust for the benefit of the unsecured creditors.

• On the Effective Date, all assets of debtor revested in the reorganized debtor.

• On the Effective Date, the Liquidating Trustee implemented the Plan provisions for the post-confirmation operation of the clinics to increase their profitability and enhance their value in preparation for an eventual sale. The proceeds of the sale will be used to partially satisfy the claims of unsecured creditors in accordance with the Plan.[14] The day-to-day operations of the clinics continue to be performed by Performance Improvement Resources.

• On the Effective Date, an Advisory Committee was appointed. That committee has the authority to act as an advisory board of directors and has the power of oversight of the Liquidating Trustee and the manager of the reorganization debtor.

• Distributions have commenced. A distribution has been made to administrative and priority claims, including that of the Internal Revenue Service ("IRS"). There is approximately $3,666 remaining on the IRS's secured claim.

---

[14] The trustee had estimated that unsecured creditors would receive a return of approximately ten to twenty percent.

These transactions and the disbursements to administrative and priority creditors compel us to conclude that the Plan has been substantially consummated. However, substantial consummation by itself does not resolve the issue. We still must consider whether we could grant effective relief. First Fed. Bank of Cal. v. Weinstein (In re Weinstein), 227 B.R. 284, 289 (9th Cir. BAP 1998).

The Marshalls have requested a myriad of novel forms of relief given the order on appeal. They "suggest" that (1) the chapter 11 bankruptcy was improper because the Keetons declared themselves managing members of debtor; (2) the Keetons had no standing in the case to join in the UST's motion for the appointment of a trustee; (3) the Keetons are not good faith purchasers and any such finding should be "revoked"; (4) the Keetons should be excluded from having any input into the chapter 11 case; (5) no payments are due to the Keetons from debtor; and (6) the trustee should be removed from the status as a trustee for debtor and another trustee should be appointed to review his activities.

In essence, the Marshalls seek a "do over" of the entire bankruptcy proceeding which they themselves commenced over three years ago. The orders appointing the trustee and granting the Keetons good faith purchaser status are final orders and, as such, we do not revisit the merits of those orders in this appeal. In addition, were we to grant the Marshalls' remaining "suggestions," an unraveling of the underlying bankruptcy case would occur and innocent third parties would be affected. Even if there were some merit to the Marshalls' argument — which

-20-

there is not — an unraveling of the case would produce unacceptable and inequitable results.

Absent the negotiated agreements with Keeton-King, debtor would once again become enmeshed in costly and protracted litigation. Further, absent the lease agreement with Keeton-King for the McMinnville Property, the operations of the McMinnville clinic would be put at risk. Without the McMinnville clinic operations, the modest return to unsecured creditors would further be reduced.

In short, under these circumstances, the substantial consummation of the Plan is the "event" that has occurred during the pendency of this appeal that makes it impossible for us to grant effective relief to the Marshalls. If no effective relief is possible, we must dismiss this appeal for lack of jurisdiction.

**2. The Appeal Is Equitably Moot**

Even if we could fashion some effective relief, we conclude that the Marshalls' appeal is also equitably moot for several reasons. First, there was only one objection to the Plan — which was later withdrawn — and the Marshalls themselves never objected to the Plan or even appeared at the confirmation hearing. Second, it is undisputed that the Marshalls did not appeal the confirmation order or seek a stay of the implementation of the Plan. Next, as discussed above, the Plan has been substantially consummated and the Marshalls' requested relief would affect both the rights of parties not before us in this appeal and the success of the confirmed Plan. Finally, any relief at this late date would undermine the strong policy

-21-

favoring the finality of confirmation orders that is recognized in this circuit. See Great Lakes Higher Educ. Corp. v. Pardee (In re Pardee), 193 F.3d 1083, 1087 (9th Cir. 1999). Therefore, even if we could fashion effective relief, it would be inequitable to do so under these circumstances.

In sum, upon consideration of the principles of both constitutional and equitable mootness, we conclude that this appeal is moot and should be dismissed for lack of jurisdiction.

**B.     The Merits**

Even if this appeal were not moot, we affirm the bankruptcy court's decision on the merits.

Absent an appeal, the parameters for revocation of a plan are circumscribed by § 1144 which provides:

> On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud. An order under this section revoking an order of confirmation shall-
>
> (1) contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation; and
>
> (2) revoke the discharge of the debtor.

Section 1144 makes clear that "[t]he sole permissible basis [for revocation] is fraud that is complained of within 180 days. If there is no fraud, the order cannot be revoked."[15] Official Comm. of Unsecured Creditors v. Michelson (In re Michelson), 141 B.R. 715, 723 (Bankr. E.D. Cal. 1992).

Here, the record does not show that the order confirming

---

[15] The Marshalls' motion was filed well within the 180-day period.

the plan was "procured by fraud." The Marshalls simply reiterate the fraud of the Keetons and Keeton-King in their opening brief, but then ask this Panel to conclude that the trustee must have participated in the fraud because he turned a "blind eye" to obvious questions raised by the Marshalls' unsubstantiated allegations especially when: the trustee (1) declared the Keetons a "good faith purchaser"; (2) testified falsely about the Committee's involvement in the settlement of the Keeton-King unsecured claims; and (3) ignored that KKC was a partner in ABC Partners, LLC; that ABC Partners, LLC had collateralized Marshall McMinnville, LLC properties on March 23, 2006 and that the Marshall McMinnville, LLC was "missing" monies.

The record does not support the conclusion the Marshalls' advocate. It was the bankruptcy court, not the trustee, that determined that Keeton-King was a good faith purchaser after a lengthy hearing. The Marshalls did not appear at the hearing for this determination or appeal the ruling. Further, there is nothing in the record that supports the Marshalls' allegation that the trustee testified falsely about the Committee's involvement in the proposed settlement of the Keetons and Keeton-Kings unsecured claims. The Committee's counsel represented at the December 14, 2010 hearing that the Committee withdrew its letter objection to the settlement. Counsel also acknowledged that the Committee had gone over the facts and all of the issues and did not object to the settlement.

The Marshalls also provided no support for their assertion that the trustee knew or should have known about the

-23-

transactions between Keeton-King and ABC Partners, LLC or the alleged "missing monies." We found no evidence in the record that even comes close to suggesting that the trustee somehow used this information to perpetuate a fraud upon the creditors or the court when he proposed the Plan.

In short, bald assertions and conclusory statements do not prove that the confirmation order was "procured by fraud." There is simply no evidence in the record that the trustee engaged in a fraudulent plan or scheme or that the creditors or bankruptcy court were actually deceived by any fraudulent misrepresentations, false statements, or omissions in connection with the confirmation of the Plan. Accordingly, the bankruptcy court properly denied the Marshalls' motion to revoke the Plan.

Because the Marshalls also seek relief from the Plan in their opening brief under § 1129(a) and Civil Rule 60(b) and (d), we reiterate that an order confirming a plan can only be revoked under § 1144. In re Orange Tree Assocs., Ltd., 961 F.2d at 1447. Thus, neither § 1129(a) nor Civil Rule 60(b) provides an alternative basis for revocation of the Plan. In any event, the Marshalls offered no coherent basis for the reversal of the confirmation order under § 1129 or Civil Rule 60(b) or (d).

## VI.  CONCLUSION

For the reasons discussed, we DISMISS this appeal as moot. Even if this appeal were not moot, we would AFFIRM the bankruptcy court's decision on the merits.

-24-